UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

ERIC P. MAINS
**PLAINTIFF**

VS.

**4 :15** -cv- **036 SEB -WGH**

CIVIL ACTION NO. _____

*Electronically filed*

CITIBANK, N.A. as TRUSTEE for the WAMU-HE2 Trust
CHASE BANK, N.A.
CYNTHIA RILEY
NELSON & FRANKENBERGER, P.C.
CHRISTINE A. SAUERER
JODI SOBOTTA
BLACK KNIGHT Financial Services, LLC (formerly LPS)
WASHINGTON MUTUAL BANK
BOSE MCKINNEY & EVANS, LLP; and
UNKNOWN JOHN DOE'S
    **DEFENDANTS**

## JURISDICTION & VENUE

1.     This Court has jurisdiction for all counts under 15 USC 1692k(d) and 28 USC 1331, 1337, 1367 because Plaintiffs' claims constitute a federal question arising under the FDCPA.

2.     Venue in this District is proper because Plaintiff resides here and Defendants do business, or have done in this District under 28 U.S.C. 1391, and because the Plaintiff's resulting damages occurred in this district.

3.     This Court has jurisdiction for Count 1 under The Real Estate Settlement Procedures Act found at 12 U.S.C. § 2601-2617.

4.     This Court has jurisdiction for Count 2 under via 28 U.S. Code § 1367

5.     This Court has jurisdiction for Count 3 under Truth in Lending Act, (TILA) 15 U.S.C. 160., et. seq.

1

6.      This Court has jurisdiction for Count 4-7 under SUPPLEMENTAL

JURISDICTION via 28 U.S. Code § 1367

7.      This Court has jurisdiction for Count 8 under the Fair Debt Collection Practices

Act, 15 U.S.C. 1692.

8.      This Court has jurisdiction for Count 9 under The United States Racketeer

Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. Section 1961, 1962, and

1964.

## PARTIES

**Plaintiffs**

9.      Plaintiff, Eric P. Mains, is a natural person, citizen/resident of the State of

Indiana, and resides in Clark County.

**Defendants**

10.     Citibank USA, a Delaware corporation, d/b/a Citibank, N.A. and all affiliated

entities, conducts business in Indiana and incorporated in the state of Deleware located at

SECRETARY OF STATE TOWNSEND BLDG, Dover, Delaware 19901-1234,

11.     Black Knight Financial Services, LLC (formerly Lender Processing Services

(LPS)) is an American limited liability company, doing business in Indiana and is

headquartered at CORPORATION TRUST CENTER, 1209 ORANGE ST, Wilmington,

DE, 19801.

12.     J.P. Morgan Chase & Co., d/b/a Chase Bank, N.A. and all affiliated entities, is a

corporation doing business in Indiana and headquartered at 270 Park Avenue

New York, NY 10017.

13.    NELSON & FRANKENBERGER, P.C. is an Indiana Law Firm doing business in Indiana and located at 3105 East 98th Street, Suite 170, Indianapolis, Indiana 46280.

14.    BOSE MCKINNEY & EVANS, LLP is an Indiana Law Firm doing business in Indiana and located at 111 Monument Circle, Suite 2700 Indianapolis, Indiana 46204.

15.    The former Washington Mutual Bank was incorporated in Delaware with Chase Bank listed as Successor.

16.    CYNTHIA RILEY, is a natural person and residence is unknown at this time.

17.    CHRISTINE SAUERER, is a natural person and is a natural person and residence is unknown at this time.

18.    JODI SOBOTTA, is a natural person and residence is unknown at this time.

## FACTUAL ALLEGATIONS

19.    Mains signed a promissory note (Hereinafter "Note") and mortgage (Hereinafter "Mortgage") listing **Washington Mutual Bank** (Hereinafter "WAMU") as Lender and secured party per the attendant Mortgage, both instruments signed on December 19, 2006. The collateral for the Note was the Mains' primary residence with the address of 2635 Darien Drive, Jeffersonville, IN 47130.

20.    John Dormany, the loan officer who worked for First Meridian Mortgage ("FMM"), the original loan broker Mains used to locate a lender in October 2006, had Mains fill out a loan application after selling the Mains on the idea that a chosen lender would provide a loan for Mains with key features that were attractive to him. Mr. Dormany indicated that a chosen lender would provide Mains with a traditional loan that would meet the representations made to him. He indicated the loan would be

provided by a traditional lender who would provide responsive servicing and professional and prompt interaction with Mains, the same as Mains would expect to be provided from any bank or credit union Mains might open an account with in his town of residence.

21.     Unbeknownst to the Mains however, FMM and WAMU and its loan officers were acting as brokers or agents associated with interim funding lenders, meaning their "loan" would be provided through a warehouse system that was intended to lead to the securitization of Mains' promissory note through a structure that was not a traditional lender to borrower structure. While the concepts and actual mechanics of securitization of home loans is not void or illegal IF PERFORMED PROPERLY, the botched and fraudulent process that happened on Mains' loan (and thousands of other single family home loans like his) made these loans ineffective and unenforceable in the hands of the investors who were the source of funds for the actual loans like Mains.

22.     The crux of the problem in Mains' case (and again, other homeowners who went through the same botched process Mains was exposed to), was that the banks and brokerage houses that were trying to ram these loans through at light speed in the name of astronomical profits had in fact never funded the investment trusts (The IRS defines them as Real Estate Mortgage Investment Conduits, hereinafter referred to as "REMIC's"). Banks like WAMU had represented to hundreds of these various investors, foreign and domestic, that they would be the ultimate holder and legal purchasing entity of these loans through the REMIC Trusts that were formed. The REMIC's as the investment vehicle for the investor's money were supposed to provide a tax free stream of income derived from the underlying homeowner loan payments, as

4

long as the REMIC was properly formed and funded per IRS regulations, regulations including that the REMIC Trust was the entity purchasing the loans and that all loans identified for purchase by the REMIC Trust would then be transferred into the REMIC's within the IRS mandated 90 day closing date of the fund to avoid a taxable event that could lead to the funds dissolution.

23.     Unfortunately for the investors, many of the banks involved in the securitization process (like WAMU) failed to perform these securitizations properly, hence as mentioned above, the securitizations were botched and ineffective as to passing ownership of the notes or underlying collateral. The loans purchased were not purchased *through* the REMIC entities as required for the securitization to occur properly. If the entity held out to be providing the money for a purchase is not the one actually doing the purchasing (WAMU in Mains' Case), it is akin to a straw man situation with an undisclosed or unknown agent acting as buyer, a clear violation of the Truth in Lending Act, RESPA, and regulation Z. This is not allowed under IRS REMIC rules either, as the REMIC trust entity must be the one actually purchasing the mortgages directly.

24.     This violation of REMIC trust rules occurred because the entities involved, for reasons of control, speed of transaction, and to hide what they were actually doing with the investors funds once received, held the investor funds in the "lender" banks own subsidiary accounts, instead of funding the REMIC trusts with the money so that the trust could then purchase the loan from the "lender", making it an actual buy and sell transaction. The banks involved skipped this step and instead used the investor funds to purchase the loans directly from the banks account, i.e, they cut out the required

middleman, the REMIC trust. Secondly, they failed to properly endorse or transfer thousands of these loans into the trusts as required, **and** they failed to do so within the mandatory 90 day close date entailed by the IRS.

25.    The botched securitization process described above is documented to one degree or another in the dozens of news articles and books written regarding the economic crash of 2008, such as Michael Lewis <u>The Big Short</u> and Andrew Ross Sorkin's <u>Too Big Too Fail.</u> One does not need to read a book or news article to see that this is exactly what happened however, one can simply look at a transaction like Mains with the available evidence, and evidence that can be had from discovery to understand the why the process the banks involved held out as having occurred in securitizing his loan, in fact did not occur.

26.    Mains perspective in this case is a rather unique one, as Mains is an employee of the Federal Deposit Insurance Corporation (hereinafter, "FDIC") who worked in the Dallas field office of the FDIC in the Division of Resolutions and Receiverships (Hereinafter "DRR"), said division which was the one responsible for closing WAMU and acting as its receiver. Mains worked with one Robert Schoppe in his division, whom the Defendant Chase Bank often cites to when pulling out an affidavit Robert signed. This affidavit states that Chase Bank had purchased "certain assets and liabilities" of WAMU in the purchase transaction from the FDIC as receiver for WAMU in 2008. Chase Bank uses this affidavit ad nauseam to convince the court system in foreclosure cases that this affidavit somehow proves that Chase Bank purchased "every single conceivable asset" of WAMU, so it must have standing in all court cases involving homeowner loans originated through WAMU, or to put it simply

that this proves Chase became a holder with rights to enforce or a holder in due course of the loan as defined by the Uniform Commercial Code. Antithetically, when it wants to sue the FDIC for a billion dollars or so due to mounting expenses from the WAMU purchase transaction, it complains that the purchase agreement is signed didn't really entail the purchase of "every asset and liability"of WAMU , at least Chase Bank claims this when it feels it is to their advantage in a lawsuit to do so.

27.      Mains worked as a Team Leader in the DRR Dallas office of the FDIC from August 2010-December 2013, and his position required him to assist in the closing and sale of near failing banks that would go through the receivership process of the FDIC. In most cases, the institutions would be sold to an acquiring institution (such as Chase Bank when it purchased WAMU) unless the bank was able to raise its capital level above critical levels, Mains is still an active FDIC employee at this time so he cannot release non-public details of the transaction in this complaint. Mains will, however, note that on a rapidly failing institution such as WAMU was in 2008, one with over $307 billion in assets, knowing every asset the FDIC did and did not transfer, and every liability the FDIC did and did not transfer, is not an accounting exercise with pinpoint accuracy.

28.      Immediately before it failed in 2008, WAMU was servicing for itself and other banks loans totaling a reported $689.7 billion, of which $442.7 were for other banks. The process a FDIC receivership goes through simply does not dig down to the granular level of what loans are, or are not, in a REMIC trust, or look into whether the underlying paperwork was validly transferred or legal. It was simply not possible at WAMU, given its sheer size and complexity. The process on the WAMU receivership

and sale was more akin to a rushed "going out of business" sale, backed by a purchase agreement that says, "You bought it, you own it, whatever that may or may not be" to said purchasers of the business. Think of it as a glorified version of A&E cable networks show <u>Storage War's</u>.

29.     Given the above as partial background, Mains notes the following in items A-F below (which will be proven by the information contained within this complaint, and through further discovery in this matter):

A.   The entity whose name appears on Mains' collateral documents (Note and Mortgage) as "Lender" (WAMU) was lender in name only to conceal certain essential facts of the transactions involved. These facts include that the purpose of the "real estate closing" (involving WAMU by way of the loan "originator" FMM) was to procure the Note and Mortgage as collateral for securitization offerings, a fact which was never disclosed to the homeowners like Mains that FMM originated loans for. Mains, and thousands of other homeowners like him, believed that they were obtaining a conventional mortgage loan from the lender named on the note and mortgage they signed (using that lenders funds, not an undisclosed investors) and that is whom they would be dealing with directly with questions, concerns, etc., on their loans, albeit occasionally with a Servicer who the Lender might hire to help deal with their loan.

B.   WAMU used funds transmitted by undisclosed third parties to acquire Mains' Note and Mortgage, which is centrally important because WAMU was effectively not the true lender for Mains' loan transaction. Purportedly

8

Mains' Note was transferred to the WAMU HE-2 Trust, but in fact this transfer never properly occurred. WAMU made sure that they would retain any "servicing rights" for the purpose of taking payments from Mains in the devised transaction, the unfortunate flaw with this was that absent a true sale and assignment of Mains' loan to the WAMU HE-2 Trust, WAMU was in fact never a Servicer. What they were, and the status of the ownership of Mains' loan, has been a 6+ year long object of litigation between Mains and multiple parties involved.

C. Mains' note and mortgage may have been pledged multiple times, to multiple entities, without actually being transferred properly. This was not an unusual occurrence during the economic collapse (brought on by banks such as WAMU, Countrywide, and IndyMac) as the loans like Mains' were pledged and sold on paper to reap insurance payments, Credit default swap payments, TARP fund payments, etc., which said payments could reap multiple payouts for multiple parties off from one loan. Again, it is very possible some of these payments were collected on Mains' loan as well, but of course Chase Bank as Defendant seems to have an extreme aversion to opening the books as it relates to Mains' loan transaction which is unfortunately par for the course in foreclosure actions such as Mains. In fact, Mains' loan file and all database transactions related to Mains' loan through Chase Bank and the former WAMU as "Servicer" for his loan (which should contain the chain of transactions involved with his Mortgage and Note), has never been made

available to date to Mains. This is a situation Mains seeks the courts aid in providing an accounting for in this lawsuit and through discovery.

D. Many of the trustees of the REMIC trusts engage in a pattern of intentionally hiding data regarding the loans supposedly purchased for the trust's investors. In fact, in many instances investors have been forced to sue to gain access to the information the trustees are supposed to provide them as fiduciaries in some instances. The Trustees of the REMIC trusts in some cases are desperately trying to hide the fact the loans were not purchased properly, and the investors have no recourse on the loans as held out them in the purchase agreements and prospectus for the Trusts. Such lawsuits have occurred, and continue to occur however, as Mains pointed out in his appeal from summary judgment to the Indiana Appellate Court.

E. Unfortunately for the WAMU HE-2 Trust investors the securities they held in the WAMU HE-2 Trust never came to be collateralized by the Mains Note and Mortgage as required by Section 2.01 of the Pooling and Servicing Agreement (Hereinafter "PSA") for the WAMU HE-2 Trust (See Exhibit 1). Mains' Note and Mortgage transaction was void due to fraud in the factum, and the attempted subsequent transfers of his void Note and Mortgage were also rife with fraud and forgery. **Mains has concrete evidence of said forgery and fraud**, which will be discussed infra and is also attached in exhibits. Mains is also quite sure that additional evidence that comes to light during discovery will only add to evidence of how truly corrupt and

fraudulent the entire process he went through was, most of which was unbeknownst to him until years after the transaction occurred.

F.  This mere "technicality" did not stop WAMU from using Mains' name, credit, and collateral documents to obtain investment funds from unidentified third parties (whom also had no idea they were being defrauded as Mains was). WAMU, and later Chase Bank, has identified the supposed investment purchasers for Mains Note and Mortgage in their foreclosure action against him as the "Holders of the WAMU HE-2 Mortgage-Backed Pass Through Certificates Series 2007," but as stated above they are not the legal holders in due course or real parties in interest as to Mains' loan payments, or otherwise beneficiaries of Mains' Note and Mortgage due to the fraud and forgery involved. Moreover, neither is the WAMU HE-2 Trust, of which Citibank N.A is Trustee, because the defective and fraudulent documents created in this case did not convey any rights to Mains' Note and Mortgage to the Trust. Chase Bank most certainly did not convey this when purporting to do so *years* after the Trust's closing date in violation of the PSA and IRS REMIC rules, this aside from the issue of the forged and fraudulent documents Mains recently uncovered which made any attempted conveyance of the void Note and Mortgage a nullity.

30.      Initially Mains was advised to make payments on his Note and Mortgage to WAMU. However, on September 25, 2008 WAMU bank failed under the weight of the risky and questionable notes and mortgages it had been peddling and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver of WAMU.  The

FDIC, as receiver, sold WAMU to J.P. Morgan Chase ("Chase Bank") as part of a whole bank transaction minus "certain assets and liabilities." There was no detail as to what was and was not transferred in this sale of certain assets, and it is not clear if Mains' note was part of this transaction as was and will be discussed supra and infra. In evidence is an affidavit by Robert Schoppe of the FDIC based on what he could state at the time in regards to the transaction. This affidavit shows the FDIC transferred what WAMU bank held on that particular day (minus certain subtractions Chase insisted on) without knowing with particularity the details of all that was transferred.

31.     Mains tried unsuccessfully on three (3) (See Exhibit 2) different occasions to send a requested loan modification package to WAMU, only to be told that package was "lost" or "incomplete" even though Mains had filled out all items required of him. In fact, Mains talked to representatives at WAMU on the phone about his loan modification package he sent to them, was told his package to modify was received, then was later told it had become "lost". (See Exhibit 2). Mains knew something was terribly wrong with the process and did not believe what he was being told by his "Servicer", but could make no headway with them in all of his multiple efforts to do so. In fact, as described in painful detail in many articles since the crisis, it was standard practice for many loan servicers to lead borrowers on a literal wild goose Chase (Pun intended) to modify their loans with no intention of doing so. This is because Servicers could charge higher fees to those it represented it was Servicing the loans for (i.e, REMIC Trust Investors), listed usually as Default Servicing Fees in Trust PSA documents, and as can be found in WAMU HE-2 Trust PSA. Chase never intended to modify Mains' loan or others, just to drag out the default servicing period, collect

higher fees, then foreclose on the properties once the tortured and frustrated homeowners gave up. This pattern of callous disregard for homeowners in the pursuit of profit, oblivious to the anguish and cost to these families, was standard operating procedure for Chase in claiming right to Service the home loans (regardless of actual legal right to do so).

32.     It should be noted at this point that even former Chairman for the FDIC, Sheila Bair, who was highly respected by Mains and many other fellow FDIC employees, has noted the following about the servicers tactic of "losing paperwork" (as they did in Mains' case) and then offering false modifications :

> "Servicers quickly discovered that they could game HAMP in their own interest, using it as a kind of predatory lending program. One tactic was to chronically lose borrowers' income documents to extend the default period." "I'm doing a book now," Bair says, "and [in] almost every family I interviewed, servicers had lost their paperwork at least once." Prolonged "trial modifications" allowed servicers to rack up payments and late fees while advancing the foreclosure process behind the borrower's back. They could then trap the borrower after denying the modification, demanding back payments, missed interest, and late fees, using the threat of foreclosure as a hammer. "They created a situation where the borrower would start making the payments, end up not getting the modification, and still go into foreclosure."

33.     In May of 2009, Chase Bank sent Mains correspondence indicating that they had now become the Servicer for his loan. Mains was never able to confirm that Chase Bank N.A had in fact purchased his loan from the FDIC, or that Chase Bank was in fact the legal Servicer of his loan for whomever was the Holder in Due Course (HDC) of his loan since WAMU Bank's dissolution. In fact, even after the dates of these Chase Bank notices Mains received other notices regarding his loan still on WAMU letterhead, including his "Loan" acceleration notice. (See Exhibit 3).

34.     Mains, unable to work with or confirm who the actual HDC of his loan was, or who was their agent, stopped making the increased payments he could no longer afford to make. Mains had no confidence that his payments were being handled properly or were going to the proper party in interest anymore in light of the seeming incompetence he ran into when he tried to modify his loan. His hope was that if he could not find the true party in interest that he could negotiate some kind of payment arrangement on his "loan" with, that he could instead try the reverse tactic and motivate said party to come forward and find Mains. Once the true HDC of his loan or their agent came forward he would be able to work with them to confirm who held his loan, who was collecting his payments and where they were being applied, and who had the legal right to negotiate his loan.

35.     However, Mains was wrong about how the process worked as he would later discover. He was wrong because it was never disclosed to him exactly who the parties were that provided the funds for his loan, what their interests were in providing those funds, and how his payments were actually being used when he submitted them. While Mains payments went 90 days without payment from him to WAMU/Chase Bank in April or May of 2009, Mains loan "statements" from Chase showed a decrease in balance of his loan, and the current balance is now lower ($171,284) then it was when his acceleration notice was issued. Mains contends that due to the fraud that occurred with his loan transaction, his loan has in fact never defaulted as to any of the Defendants in this case, nor has their accounting for the transactions been appropriate or accurate. This has opened them to liability as to how Mains payments were handled and how the transaction he was involved with was structured.

36.     Without being able to get answers and information, the Mains sought legal assistance through Rachele Cummins at the Smith Carpenter Law Firm in Jeffersonville, Indiana in 2009, shortly after he received a notice of default from Nelson and Frankenberger Law firm in Indianapolis (hereafter "N&F"). The default letter is hereafter referred to as the "NOD". However, it was not until April 20, 2010 Citibank N.A (purportedly on behalf of the WAMU HE-2 Trust) filed its Complaint and Mortgage Foreclosure against Eric Mains and Anna Mains in Clark County Indiana Circuit Court under case number 10C01-1004-MF-000248.

37.     Mains and his counsel discovered during the course of their research into his loan that his mortgage note had supposedly been transferred to an entity known as the WAMU HE-2 Trust. The WAMU SERIES 2007-HE2 Statutory Trust, (Hereinafter "Trust") File #4329672 with the Delaware Division of Corporations, with Citibank, NA as Trustee, was incorporated on April 4, 2007. His loan was allegedly purchased with investor money which was placed in the Trust, and the Trust then supplied the money to purchase Mains' home at 2635 Darien Drive, Jeffersonville, IN. Mains only real documentation as to Citibank and the WAMU HE-2 Trusts claim of ownership came from the NOD from 2009 and the April 20, 2010 foreclosure filing itself listing Citibank as Trustee for the WAMU HE-2 Trust as Plaintiff, even though nowhere in Mains' loan documents was it indicated that these entities were a party to his loan agreement, nor had he ever negotiated with these entities.

38.     Without any evidence to support such an assertion, or that the WAMU HE-2 Trust was the HDC of Mains' Note and Mortgage (or that Chase Bank had ever acquired that status when it entered into the purchase agreement with the FDIC for

WAMU for that matter*), Chase Bank was claiming to be the Servicer for Mains' loan by virtue of Citibank North America (as Trustee for the WAMU HE-2 Trust), allegedly having designated that Chase Bank was acting as a recognized Servicer for the Trust loans, which again, was based on the allegation that Mains' loan was legally held by the Trust as well*. This, even though as will be discussed infra, the Trust documents indicate a WAMU entity was the designated Servicer for the Trust, and after WAMU's dissolution there is no evidence that Chase Bank was ever designated the replacement Servicing Agent for the Trust as is required by the Trust PSA to be documented.

39.     Mains counsel requested a settlement discussion as authorized by Indiana Statute IC §32-30-10.5-8 to discuss his loan. The meeting was held on July 21, 2010 at the Clark County Court building in Jeffersonville, IN.   Cummins and Mains were in attendance at this meeting. Counsel for Chase Bank (in its alleged capacity as loan servicer for the Trust) was present, and other Chase Bank representatives attended via the phone from a remote location.

40.     Mains questioned the Chase Bank representative about the WAMU HE-2 Trust, as he and his counsel had obtained a publicly available copy of the WAMU HE-2 Trust Prospectus and Pooling and Servicing Agreement (PSA) online from the EDGAR SEC database where they were required to be filed, and had become familiar with the provisions of the PSA. Mains asked the Chase Bank representative how Chase Bank claimed any authority to negotiate any proposed modification of his loan. The Chase representative indicated they had authority as his loan Servicer to do so. Mains then indicated that since his loan was supposedly held by the WAMU HE-2 Trust, and modifications and other actions required certain Trust approvals per he and his counsels

review of the PSA, where they derived their authority to take such actions unilaterally without required consents. Again, the Chase representative indicated they had such authority as Servicer for his loan. Mains then questioned Chase about their ability to unilaterally alter the terms of his loan or negotiate changes they were indicating without a documented Trust approval or vote, and the Chase Bank representative again indicated it had this authority. Mains indicated he disbelieved they had such authority as it would violate the PSA of the Trust they claimed to be an agent for and be a void action that would not be enforceable or could be relied on by him if so offered. The meeting ended without any resolution.

41.        On August 30, 2010 Citibank, through retained counsel at N&F, made a motion for Summary Judgment as to Plaintiff's Complaint on Note and To Foreclose Mortgage in Mains case. It then mysteriously withdrew this motion dated November 1, 2010. Their motivation for doing this soon became clear. The OCC, as primary regulator for Chase Bank and Citibank among others, had started an investigation into foreclosure practices at these banks and the hammer was about to drop in the form of consent orders, civil penalties, and independent foreclosure reviews.  From that OCC report,

> The OCC consent orders required servicers to retain independent consultants to conduct a comprehensive review of their foreclosure activity in 2009 or 2010, to identify financial injury that resulted from deficient foreclosure practices, and provide compensation or other remedy for that injury. That review includes a process for people to request a review of their loan files, as well as a process where the consultants select samples of files from the servicers' portfolios." And further, "Servicers also submitted action plans as required by the consent orders, which describe actions required to fix other mortgage servicing and foreclosure process deficiencies.

42.     These required reviews under the consent orders agreed to by Citibank and Chase entailed the delay of foreclosure actions from 2009 and 2010 to review these actions for defects in the process and documentation. These defects would include items such as: whether the assignments were valid and contained errors; small defects, for example, like trying to assign Deeds of Trust in States that do not use Deeds of Trust (such as Indiana). Little things like whether assignments were signed by former employees who no longer worked for the bank they supposedly were signing for at the time the documents were executed; or whether the Servicer agents and attorneys for the banks involved were "robo-signing" or backdating documents. This review by all the parties in the chain would also include identifying defects relating to monetary claims if errors existed, i.e, if account statements were accurate thereby supporting any claims that the supposed party in interest to a loan dispute was actually monetarily damaged and as to what amount.

43.     Mains case history is available on the Chronology Case Summary ("CCS") system found at mycase.in.gov. The discovery requested of N&F, who were initially retained by Chase Bank/Citibank (through LPS, but known to Mains at that juncture) to represent their alleged shared interest in Mains' foreclosure action, is on the CCS. In the discovery requested, Mains pointedly asked N&F to confirm exactly what the OCC required of the banks they represented to confirm per the recent consent order: a.) By what right are you claiming you have standing to foreclose on Mains home? B.) Where is your evidence of default and damages under Mains' loan? C.) What have you done to confirm proper chain of title, and that the assignments you claim evidence ownership are valid and enforceable? The responses received parroted the same talking points

Chase gave at the settlement discussion 7/21/10 to Mains and his counsel, "We have good title, ownership, and obeyed all applicable laws". The N&F response also included the statement that, "Information was intentionally excluded because it contained privileged information" when they were asked where a loan listing schedule was that showed Mains' note was part of the Trust. Unfortunately, these responses were patently false as can be seen from the attached evidence Mains provides herein.

44.     On February 11, 2013, over 2 1/2 years after Chase Bank held the above mentioned meeting with Mains and his counsel, Citibank re-filed its Motion for Summary Judgment.

45.     On March 11, 2013 Mains filed his Response to Citibank's Motion for Summary Judgment.  In his response, Mains raised a number of issues which he argued precluded summary judgment for Plaintiff Citibank. These issues included: 1.) Plaintiffs failure to prove standing to enforce his note as the proper party in interest, 2.) Failure to provide proper evidence of mortgage assignment and chain of title, 3.) Failure to provide a listing that Mains' loan was part of the WAMU HE-2 Trust 4.) Claiming to have transferred Mains' loan into the Trust *years* after the Trust's closing date in contravention of the Trust PSA and IRS REMIC rules which would void the Trust for trying to transfer non-conforming loans into the Trust more than 90 days after the close date, 5.) Failure to cite a specific event or date of default as to his mortgage note, 6.) Failure to specify evidence of amounts due or damages to Plaintiff under his note, or evidence of  interest rates applied or payments applied on his note, other than through a loan detail statement from Chase Bank's servicing records (not, conspicuously, the

WAMU HE-2 Trust accounting records, who was the party supposedly claiming it was damaged via the Trustee Citibank in Mains' case).

46.     On April 30, 2013 the hearing on Motion for Summary Judgment was held and the matter was taken under advisement. On May 3, 2013 Summary Judgment was granted in favor of the Trust/Citibank in rem and in personam.

47.     On June 3, 2013 Mains filed his Motion to Correct Error Thereby Denying Plaintiff's Motion for Summary Judgment and Decree of Foreclosure. Mains introduced the newly decided case of *Wells Fargo Bank, N.A. v Erobobo*, 2013 NY Slip Op 50675(U) (Sup. Ct. Kings, Apr. 29, 2013) where the court found noncompliance with assignment provisions of the Pooling and Servicing Agreement ("PSA") and New York Statutory Trust Laws voided the attempted assignment of a note and mortgage to the Plaintiff's in that case. Mains also reiterated his earlier arguments in his objection to the motion for Summary Judgment.  Citibank filed Plaintiff's Statement in Opposition to Defendant's Motion to Correct Errors and Motion to Set Aside Summary Judgment on June 24, 2013.  On August 6, 2013 the court held a Hearing on Mains' Motion to Correct Error and the matter was taken under advisement.  On August 8, 2013 the Motion to Correct Error was denied.

48.     Mains filed his Notice of Appeal on September 12, 2013. Mains reiterated his earlier arguments, and bolstered them as well. Mid-2014 the Appeals Court ruled against Mains without discussion of the many points he brought up in his appeal, including any discussion/analysis of HDC status by Citigroup or Chase, or claims that attempted assignments made on Mains mortgage loan were in fact void ab initio.

49. On October 4, 2014 Mains filed a motion to transfer his case to the Indiana Supreme Court based on 4 questions.

    a. **Question #1**-Did the court violate Mains' constitutional rights under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution through the state court's action to deprive him of title to and possession and enjoyment of real property by enforcing a judicial foreclosure against his economic interests based solely on a recorded mortgage and attempted mortgage assignments without first also requiring that the claimed mortgagee prove valid chain of title, holder, and holder in due course status to be able to enforce the note and mortgage as is required by the Uniform Commercial Code ("UCC"), and in order for court to have subject matter jurisdiction?

    b. **Question #2**-Did the court commit reversible error and violate Mains' constitutional rights under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution through the state court's action to enforce appellants money judgment claim without first requiring evidence of actual monetary damage suffered by the claimant and the validity and accuracy of amounts claimed owed?

    c. **Question #3**-Did the court commit reversible error and violate Mains' constitutional rights under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution through the state court's action to deprive him of title to and possession and enjoyment of real property by enforcing a judicial foreclosure against his economic interests when basing their

judgment in whole or in part upon hearsay evidence which was required to be excluded from their consideration under Indiana state statute and Indiana case law?

    d.  **Question #4**-Were Mains' constitutional rights under the Equal Protection Clauses of the Fourteenth Amendments to the United States Constitution violated as a result of a pattern practice in Indiana courts that treats homeowners in mortgage foreclosure actions differently as a class than it treats other litigants through the disparate application of the UCC in mortgage foreclosure actions, and a disparate application of the rules of evidence in mortgage foreclosure actions?

50.     Mains was notified on January 22, 2015 the Indiana Supreme Court denied Mains transfer request.

51.     It was in 2011 (as mentioned supra) that the OCC and other bank regulators slapped the nation's largest banks with unprecedented penalties for improper home-foreclosure practices, issuing detailed orders to revamp the way they deal with troubled borrowers. Specifically, a Consent Order was issued on April 13, 2011, to Chase and thirteen other financial institutions by the Federal Reserve, the Office of Thrift Supervision (OTS), and the Comptroller of the Currency.  Under the Consent Order, Chase had sixty days to establish plans to clean up its mortgage-servicing processes to prevent documentation errors. The Order directed Chase to take steps to ensure it had enough staff to handle the flood of foreclosures, that foreclosures didn't happen when a borrower was receiving a loan modification, and that borrowers had a single point of contact throughout the loan-modification and foreclosure process. Chase was ordered to

hire an independent consultant to conduct a "look back" of all foreclosure proceedings from 2009 and 2010, which would have included Plaintiff's foreclosure, to evaluate whether Chase improperly foreclosed on any homeowners. Chase agreed to establish a process to consider whether to compensate borrowers who had been harmed. The Federal Reserve ordered Chase and other big banks to clean up their illegal foreclosure practices.

52.     Chase signed a Consent Order with the Board of Governors of the Federal Reserve System on April 13, 2011. titled:  Federal Reserve Consent Order,  BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM  Docket No. 11-023-B-HC, which is available at:

www.federalreserve.gov/newsevents/press/enforcement/enf20110413a5.pdf

53.     The Consent Order, signed by Chase's Chief Administrative Officer, includes the following allegations against Chase, whom the Consent Order notes had initiated more than a quarter of a million foreclosures in 2009-2010. From the Consent Order  (as abbreviated, but not changed):

> **WHEREAS**, in connection with the process leading to certain foreclosures involving the Servicing Portfolio, the Mortgage Servicing Companies **(Chase)** allegedly: (a) Filed or caused to be filed in state courts and in connection with bankruptcy proceedings in federal courts numerous affidavits executed by employees making various assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review; (b) Filed or caused to be filed in state courts, in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

(c) Litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party; WHEREAS, the practices set forth above allegedly constitute unsafe or unsound banking practices; NOW, THEREFORE, **Chase shall cease and desist and take affirmative action**, as follows …"

54.     Mains evidence contained herein shows that Citibank and Chase Banks actions to foreclose on Mains' home were illegal because the underlying security instruments relied upon for the foreclosure are invalid and void ab initio. Chase Bank and Citibank specifically knew or should have known that there was not a valid interest conveyed to the WAMU HE-2 Trust in Mains' Note and Mortgage. Further, Chase it was not the authorized servicer of the Note for Citibank as Trustee for the WAMU HE-2 Trust due to these facts. Chase's foreclosure action against Mains was consistent with Chase's pattern of foreclosing on properties it was not a party in interest to, and to which it did not have any equitable or legal title. Chase has been severely sanctioned by state and federal courts for providing false, perjured, forged, and fabricated assignments, affidavits, verifications, and pleadings as noted above.

55.     Given the above as a backdrop, it was in December 2014 that in reviewing the "loan" documentation associated with this Federal court filing, Mains discovered that the documents associated with his "loan" contained incontrovertible evidence of fraud, forgery, and possibly backdating as well. Some of this evidence was knowingly withheld from the court by the Defendants involved. This evidence was not available to Mains until recently in some cases, but in all cases those involved in bringing the foreclosure action against Mains were aware the fraud and defects existed while Mains

case was ongoing in State court, but refused to correct or disclose the issues.

56.        To begin with, N&F stated Chase Bank (whom they claimed to be representing as the Servicing Agent for the WAMU HE-2 Trust) had standing to sue Mains on behalf of the Trust for amounts due under Mains' note and to foreclose on Mains home. In fact, Lawrence Kemper of N&F stated in a brief in support of summary judgment to foreclose on Mains Note and Mortgage that Chase Bank was the "Holder of bearer paper, Mains' note endorsed in blank." A copy of Mains Note and Mortgage is attached as Exhibit 4, and the following item is seen on this exhibit: Mains note was signed by him on December 19, 2006, and on the back of page 3 of his mortgage note there is an undated endorsement in blank, signed by one Cynthia Riley.

57.        What Mains has recently found out about Cynthia Riley was not available to him at the time the summary judgment motion was filed to foreclose on his home in 2013, namely that a 2013 deposition was filed in Federal court with Cynthia Riley as the deposed witness. Mains discovered Cynthia Riley is one overwhelmingly productive and multi-talented former bank officer.  Apparently she was even capable of endorsing hundreds of loan documents a day, and in Mains' case, even after she was no longer employed by Washington Mutual Bank (See Exhibit 5)., Cynthia Riley's deposition was taken in the matter of JPMorgan Chase Bank, N.A v. Eduardo Orazco, case No: 09-29997 CA (11), Fla. 11th Circuit Court, deposition taken January 15, 2013 in Jacksonville, Florida).

58.        **Per her deposition, in November 2006 Cynthia Riley was laid off from WAMU, and was never again employed in the Note Review Department of WAMU nor at JPMorgan Chase Bank, NA.** In fact, in November 2006 to about November

2007 Riley "did project management work for about 12 months . . . involved with was helping to move the custodial vault from Stockton to Florence, South Carolina." (See Exhibit xx, pg 62)  She apparently helped coordinate meetings and activities. Based on the preceding, one can imagine how impressed Mains was with Ms. Riley's work ethic in that she apparently decided to sneak back in the office for a day sometime after December 20, 2006 (when exactly is a mystery, as again the assignment in blank is not dated) and make sure she personally endorsed Mains note even though no longer employed as a bank officer or authorized to sign for WAMU. The above being documented, Citibank, Chase Bank, and Nelson & Frankenberger's claim of being holders of bearer paper, let alone holders in due course, are incontrovertibly false.

59.      **Unfortunately for the Defendants, blatant forgery is only one of the problems with the ownership of Mains "Note".** In further going back to review the chain of supposed assignments on Mains "Note", **Mains discovered that the initial "assignment in blank" from Washington Mutual Bank created January 5, 2007 is in fact fatally defective. The assignment states that "for the sum and consideration of $10 ....the assignor transfers...** *the Deed of Trust"* (See Exhibit 6).  **Since Indiana is a judicial foreclosure state, and does not use Deeds of Trust as recording instruments, it is unclear exactly what it is Washington Mutual was trying to assign.** Was WAMU trying to transfer the note into the Trust directly, but failed to endorse it properly? (Hence the reference to a "Deed of Trust", when what they wanted to accomplish was a transfer into "The WAMU HE-2 Trust"?). Since Mains' loan was not included in the SEC EDGAR database loan schedule of notes in the WAMU HE-2 Trust, did WAMU intend for the assignment to perfect transfer to a different Trust? We

will never know as Washington Mutual Bank no longer exists and was dissolved in 2008. **This being the case, any subsequent claims based on being a holder of Mains' note as based on the above documents, or having assigned Mains' note based on these documents, are VOID as well.**

*60.*    We move next to the assignment of Mains' note from Chase Bank to the WAMU HE-2 Trust (Hereinafter referred to as the "Chase Assignment") dated the 26th of May 2009, and recorded over *1 year later* on 14th of June, 2010 in Clark County Indiana (See Exhibit 7). **In recently reviewing this document Mains discovered that the Chase Assignment was fraudulent as well.**

61.    First, the "Attorney in Fact" for J.P Morgan Chase Bank is listed as one Jodi Sobotta. It turns out Jodi Sobotta is in fact an employee of Lender Processing Services (Hereinafter "LPS"), a firm synonymous with the "robosigning" issues which came to light in 2009-2010. **In fact, Jodi Sobotta had the honor of being listed as a "robosigner" in the successful Quo Tam lawsuit originally filed by Lynn Syzmoniak** (who was featured on the respected CBS news program "60 Minutes", **and later picked up and litigated by multiple States (Including Indiana)**. (See Exhibit 8, page 24, and also see Symoniak's fraud digest webpage included on last page of Exhibit 8.). The states AG's who joined Ms. Syzmoniak's Quo Tam suit sued multiple banks for their fraudulent mortgage backed security activities in servicing loans (Including Chase as Servicer for WAMU Trust's). This lawsuit resulted in a sizeable settlement with these "Servicers" and consent judgment as will be discussed infra. "Robo-signing" is a term that grew out of the 2008 mortgage crisis which is defined as follows (from Wikipedia),

*Robo-signing" is a term used by consumer advocates to describe the robotic process of the mass production of false and forged execution of mortgage assignments, satisfactions, affidavits, and other legal documents related to mortgage foreclosures and legal matters being created by persons without knowledge of the facts being attested to. It also includes accusations of notary fraud wherein the notaries pre- and/or post-notarize the affidavits and signatures of so-called robo-signers. On July 18, 2011, the Associated Press and Reuters[15] released two reports that robo-signing continued to be a major problem in U.S. courtrooms across America. The AP defined robo-signing as a "variety of practices. It can mean a qualified executive in the mortgage industry signs a mortgage affidavit document without verifying the information. It can mean someone forges an executive's signature, or a lower-level employee signs his or her own name with a fake title. It can mean failing to comply with notary procedures. In all of these cases, robo-signing involves people signing documents and swearing to their accuracy without verifying any of the information.*

62. Mains notes the following at this point:

    a. Defendant Black Knight Financial Services, LLC, formerly known as Lender Processing Services, Inc. ("LPS" as noted supra), is a Delaware corporation.

    b. LPS is a subsidiary of Fidelity National Financial, Inc. (hereinafter "FNF"), a Delaware corporation.

    c. LPS owns, operates and licenses LPS Desktop® software, which was used in Mains' case to create false documents to be executed by LPS employees and others for recording in the Offices of the Indiana County Recorder, as well as in public land records offices throughout the nation as noted in Syzmoniak's lawsuit. The false documents in Mains' case were created by LPS using its LPS Desktop® and compatible software programs in order to liquidate his collateral purportedly backing the mortgage backed certificates in the WAMU HE-2 Trust.

63.     This process of signing multiple foreclosure affidavits and mortgage assignments by dozens of different people other than the listed person on the affidavit, by people with no personal knowledge or clue as to what was being signed (such as Jodi Sobotta in the Minneapolis office for LPS) is well detailed in Lynn Syzmoniak's lawsuit. The obvious sign of the forged signatures are the non-descript "squiggles" which were used to endorse the affidavits, such squiggle as can be seen on Mains' assignment document next to Jodi Sobotta's name. In fact, Mains found quite a few examples of Jodi Sobotta's signature, all of different styles. Who signed Mains affidavit, and under what authority, is in question, as well as when it was notarized as will be discussed infra.

64.     Mains further notes the following at this point: Defendant Jodi Sobotta was, at all times relevant to the acts complained of herein, an adult resident of the State of Minnesota, who was employed by LPS or one of its affiliated enterprises, all of which are subsidiaries of FNF.

65.     Jodi Sobotta purportedly signed the Chase Assignment on May 26th, 2009 as "Attorney in Fact" for Chase Bank, **but she was in fact an LPS employee which N&F knew at the time they submitted the Chase Assignment to the trial court in Mains' case.**   Jodi Sobotta was employed by LPS to sign documents (like the Chase Assignment in Mains' case) which purported to convey interests in real estate *regardless of the true chain of title to those interests*, and Sobotta did so without personal knowledge of the essential facts required for the execution of such documents.

**66.**     Jodi Sobotta did not know for whom she was executing the Chase Assignment in Mains' case, or by what authority she was signing the Chase

Assignment. She did not know whether or not the conditions precedent to the creation, filing, service and recordation of the Chase Assignment had been met, in violation IC 23-2-1-12, <u>Fraudulent or deceitful acts</u>, as well as other subsets of IC 23-2-1.

67.     Jodi Sobotta was instructed by LPS or one of its affiliates to print documents from a central computer database (using what Mains believes to be LPS Desktop® software) and caused the documents to be signed by herself or, as noted above, by one of many others signing for Jodi Sobotta with no authority to do so. This is what occurred in Mains case with the Chase Assignment.

68.     Further noted is the following: Defendant Christina Anne Sauerer was, at all times relevant to the acts complained of herein, an adult resident of the State of Minnesota, who was employed by LPS or one of its affiliated entities and notarized documents for LPS or its affiliated entities.

69.     It turns out the notary who signed the Chase Assignment has a problematic history as well. Christina Anne Sauerer, formerly licensed notary in Dakota County Minnesota, supposedly witnessed Jodi Sobotta's signature. **Ms. Sauerer is listed as a known "robo-notary" on multiple website**s, **and has the magical ability (much like Jodi Sobotta) to not only change her handwriting at will, BUT she also has the distinction of no longer being a notary in the state of Minnesota and having been disciplined for some as of yet, unknown reason.** (See Exhibit 9). Her signature being a vague scribble being noted by the exhibits above, who notarized Mains document is again called into question. The next question becomes when was the document actually created and notarized?

70.     What is not in question is that at some point Christina Anne Sauerer notarized the Chase Assignment in Mains' case and caused it to be filed in the Clark County Recorder's Office at the behest of who she was told were LPS "customers," without knowing who, other than LPS or one of its affiliated enterprises, authorized the creation, execution, and filing of this document. This process happened in Mains' case and thousands of other cases in recorders offices across the nation. Christina Anne Sauerer's notarized  signature on Exhibit XX was purportedly made on May 26th 2009; however, the actual notarization date is suspected to be far after this by Mains.

71.     Both Jodi Sobotta and Christina Anne Sauerer knew that Mains' collateral documents were not in LPS possession, nor did they review them. Neither Sobotta or Sauerer had knowledge of whether or not they had any authority to sign documents as Chase Bank's "Attorney in Fact."   Both lacked the requisite understanding or knowledge as to what documents they were signing, or why they were signing them (and this is in cases where *they* were actually the ones signing the documents as opposed to others forging signatures for them, how many will never be known). They (and others) robotically went through this process of endorsing documents with squiggles, day… after day… after day… while in the employ of LPS in the Minnesota office. This is not mere conjecture, but again is documented in Syzmoniak's lawsuit.

72.     By virtue of their actions in furtherance of a scheme to defraud Mains, his counsel, the public, and the courts of and in the State of Indiana., Christina Anne Sauerer and her employer LPS violated IC 23-2-1-12, Fraudulent or deceitful acts, as well as other subsets of IC 23-2-1 by filing the Chase Assignment with  the Clark County Indiana recorder's office.

73.     One of the problems with LPS Desktop® software (and all software programs) is that once an error is placed into the database, the error will repeat ad infinitum until human intelligence discovers and corrects the error. Due to this fact, persons using the LPS Desktop® software and similar software to create documents for the purpose of transmitting the documents, printing them, signing them, notarizing them and filing them in the public records will contain the same original error until it is corrected. In Mains' case, and directly in violation of LPS's consent order with the Indiana Attorney General's office (See Exhibit 9A) LPS Settlement notice, LPS *never* corrected the error in the Chase Assignment, and N&F knew that this error was present and uncorrected as well. Simply put, Chase Bank, LPS, Citibank, and N&F all conspired to press on with foreclosure in Mains' case knowing the Chase Assignment was fraudulent and contained forgery.

74.     LPS Desktop® software and similar software programs are essential to the operation of the above described RICO enterprise in Mains' case and others because the software program generates documents which are then printed and caused to be signed by employees (and third party agents of those participating in the enterprise) solely for the purpose of making it appear that some entity purporting to be the trustee or beneficiary of the Mortgage note has complied with the Indiana statutes governing judicial foreclosures. LPS also offers a wonderful way for Chase Bank, and the Trustees of the REMIC's they claim to be Servicer for, to offer plausible deniability up to a court when this enterprise begins to be exposed. They will likely state, "we had NO idea those people were forging documents, were so sorry!" The OCC, fortunately, did not buy this excuse, and neither should the court system.

75.     It should be noted at this point that LPS settled Lynn Syzmoniak's lawsuit with the attorney generals ("AG") of the various States involved (Including Indiana) for $120 million.  LPS agreed to, "undertake a review of documents executed during the period of Jan. 1, 2008 to Dec. 31, 2010 to determine what documents, if any, need to be re-executed or corrected. If LPS is authorized to make the corrections, it will do so and will make periodic reports to the AG's Office of the status of its review and/or modification of documents." Apparently LPS and Mr. Kemper felt they could wait until after a foreclosure judgment was issued to correct the fraud they committed on Mains. In fact, so eager was Mr. Kemper and LPS to complete the fraudulent foreclosure in Mains case, that he recently sent an order to complete Sheriff's sale even though Mains' case was still pending transfer to the Indiana Supreme Court.

76.     What is interesting to note in Mains' case is that Lawrence Kemper and N&F did not tell the court (or Mains) that they were working under contract for LPS EVER. They represented in correspondence to the Court and to Mains that they represented *Chase Bank* as Servicer in Mains case. N&F, as noted supra, also failed to disclose that it was aware of the fatal defects and fraudulent documents used in Mains' case. Their employer, LPS, was the one who produced these documents for Chase Bank. It would appear that N&F was concerned, given the ongoing lawsuits like Syzmoniak's which had been filed and scrutiny being cast on the loan servicing in general due to illegal activities surrounding robo-signing and forgery, that the mere disclosure that they were retained by LPS would set off alarm bells that the documents presented in court were fraudulent and void in Mains' case. Their concern was justified.

77.     Mains also notes the law firm of Bose McKinney & Evans LLP during their defense of Citibank's foreclosure action against Mains, made patently clear in their response to Mains' appeal that certain of N&F's discovery should be ignored by the Indiana Appeals Court as this evidence was not properly designated. Why the concern to eliminate discovery responses by prior counsel? Bose McKinney was obligated professionally to have reviewed all the loan documentation in Mains' case to make sure it was valid and that they could effectively represent Citibank in the Appeal action. It is again not credible that they did not become aware of the defects in the documents and evidence their predecessor had transferred to them. In fact, once aware that Lawrence Kemper had committed fraud, instead of notifying the court as was their duty ethically to do, they instead remained silent and further asked the appeals court to ignore the "non-designated evidence" related to Kemper's discovery responses.

78.     The above facts being noted, the storyline the Defendants to this lawsuit would have the courts believe goes as follows: In May of 2009, a year before any foreclosure action was filed against Mains, Citibank as Trustee for the WAMU HE-2 Trust approved Chase Banks actions as supposed Servicer for the Trust to retain LPS, who further engaged N&F to review Mains' loan documents and personally draft an assignment of mortgage in preparation for foreclosure on Mains' home due to supposed defaults of Mains' Note and Mortgage. None of the forged and fraudulent documents backs up this narrative or a valid chain of title so far, but the story continues as follows: The known robo-signers and robo-notary's at LPS signed the assignment for Chase Bank promptly on May 26th, 2009, but then for some unknown reason the assignment

floated around in limbo ***somewhere,*** <u>until it was recorded over a year later in June of</u>
<u>2010 in Clark County Indiana</u>.

79.      The above storyline has a timing problem that Mains notes as well: Why the
over 1 year date between supposedly notarizing the Chase Assignment and the
recordation of the robo-signed document?  Further, Why would Chase Bank seek out a
an attorney through LPS a year before any foreclosure action was filed, instead of
simply having one of its staff members who were familiar with the loan simply assign
his mortgage? Why would they take the time and expense to ship all the underlying
documents across country to accomplish this? In what world with this scenario make
any logical sense? The facts would not make sense under this scenario, but would make
perfect sense if Chase Bank wanted to use LPS to create the fraudulent assignments it
needed while keeping itself remote from said fraud. When Chase Bank/LPS/Citibank
further realized they had no evidence of a valid assignment at the time they filed a
foreclosure action against Mains in April 2010 (and therefore had no standing, as
standing must exist at the time a foreclosure action is filed) LPS, Chase Bank, and
Citibank conspired to create an assignment giving them standing. Mains has shown
supra from existing evidence that with the help of master robo-signing firm LPS, that
said assignment in fact was created, was robo-signed and robo-notarized, albeit lacking
any foundation for its validity. Mains further believes that the notarization date on the
Chase Assignment (as signed by Christina Anne Sauerer) *<u>was also backdated by 1 year</u>*
*<u>before it was sent to be recorded</u>*. This is why it was belatedly recorded in June 2010,
over a year after supposedly having been created, and why the invalid assignment was
further fraudulent.

80.       From a October 8, 2010 investigative article by Abigail Field from Daily

Finance      (from          http://www.dailyfinance.com/2010/10/08/robo-signing-two-class-

actions-raise-more-troubling-foreclosure/#save19665854),      the      following   is     noted

regarding LPS and it operations, and further supports why it is unlikely the timeline for

notarization to recording is valid in Mains case:

> This translation is supported by the company's September 2006
> newsletter, in which LPS employee Dory Goebel wrote in detail
> the about how LPS's "Document Execution team" would get
> documents signed as needed for the attorneys they contracted with.
> Attorneys would request a document be signed and load it into
> LPS's software. LPS would then determine if one if its employees
> could sign the document, or if it had to be sent on to the bank client
> for signing. All documents LPS could sign were printed in
> Minnesota for execution."

81.       During the Oct. 6 conference call, LPS tried to distance itself from the attorneys

filing the robo-signed documents by emphasizing that its bank/servicer clients really

select and work with the attorneys, and that LPS is essentially an administrative

assistant go-between. But, as Gardner explained, LPS manages the attorneys; the

bank/servicer clients don't.    A detailed description of how LPS, its software, the

attorneys and the bank clients interact is laid out in an April 15, 2009, opinion by Diane

Weiss Sigmund, U.S. Bankruptcy Court Judge for the Eastern District of Pennsylvania.

Judge Sigmund was frustrated by the problematic filings that resulted from the way the

system worked -- for example, the wrong note and incorrect debt data were filed with

the court -- and found that as the system currently operated, the attorneys had little

ability to communicate with the banks that were ostensibly their clients. Instead, the

lawyers dealt with LPS and its software system. One of the sanctions Judge Sigmund

ultimately ordered was for the bank client involved -- HSBC -- to communicate with its

LPS attorneys and tell them how to get in touch directly with HSBC when necessary…"

> LPS's management of the attorneys in its network is perhaps best
> expressed by the way it rates the performance of those attorneys.
> The key metric is the speed with which the attorneys perform
> various tasks that the LPS software tracks. It uses a "3/3/3 rule":
> The attorneys have three minutes (or hours, depending on who you
> talk to) to open an email sending them a referral, three days to
> make the first filing and 30 days to complete the foreclosure. Exact
> deadlines vary by jurisdiction. For example, if foreclosure involves
> a judicial proceeding, the timeline is longer.

82.     Mains is quite sure a bit of discovery into the LPS relationship with Chase, and

their relationship with attorney's like N&F as discussed above, will further produce

evidence of Chase Bank's knowing participation in the production of fraudulent

documents as evidence used against Mains.  The racketeering enterprise as detailed by

Mains above is ongoing over multiple REMIC Trusts (such as the WAMU HE-2 Trust

in Mains' case) and operates as follows:

   a.  Chase Bank (or other major banks, dependent on the REMIC Trust involved)

       operate as a "Servicer" for the REMIC trusts (such as the WAMU HE-2 Trust in

       Mains case) with the tacit and knowing participation of various Trustee's for

       these REMIC's (such as Citibank N.A in Mains' case) for purposes of drawing

       large Servicer fee's and other compensation (such as insurance payments, credit

       default swaps. etc.). The Servicer status is validated and documented in some

       cases through the PSA, in other cases it is not, but regardless, it also goes

       without saying that one cannot be a Servicer for a loan if it is not held by the

       Trust said Servicer claims to Service the loan for. Chase Bank (and other banks)

control the pools of money in the accounts they accept. Note payments from homeowners (like Mains) into, and it is from these accounts that the REMIC Trust investors are ultimately paid from as well, so there exists no accounting separation of duties to prevent fraud. This should be the first thing sounding alarm bells. Chase Bank (and other banks) collect the funds, account for them, BUT there exists no checks or balances for the fund investors to really know if what Chase is reporting to Citibank as Trustee, then on to the investors, is accurate or not. They have no knowledge as to whether Chase Bank or other Servicers have collected compensation the investors could have claim to (such as insurance payments, etc.), and in fact this can be seen in lawsuits when investors finally get interested in what has gone on in these funds.

b. The scheme of the players in this racketeering enterprise unravels at the point at which there is an alleged default in payments under the Note by the homeowner, (aka ceasing payments to the entity actively defrauding the homeowner and others). When this event happens, the fictitious document fabrication process then begins and fabricated documents are transmitted by wire and mail to the public records offices in order to give the appearance of substantial compliance with judicial foreclosure processes.

c. The Trustee's, such as Citibank in Mains' case, know the loan documents required to have been transferred to the Trusts to give them ownership were in fact never transferred, or hopelessly defective even if transferred, but they work with Banks like Chase to hide the fact that Trusts they were supposed to be Trustee's of are, in fact, empty shells. Both Servicer and Trustee purport to be

acting for the benefit of the investors of the Trusts, even when they know the opposite is true. They use the services of LPS and its affiliated entities, and through the use of LPS Desktop® and similar software, they create assignments where documentation is lacking. These assignments are "after the fact", robo-signed, and void in a majority of cases, but they fill the need of the Servicing banks to create the illusion of standing where none exists in the courtrooms across the nation. Chase Bank used employees of LPS and LPS' affiliated entities to execute these created documents as described supra, and under false claims of authority, in Mains' case.

d.  It is part of the modus operandi of the racketeering enterprise to have attorneys representing mortgage servicers offer false arguments, based on verifications of false facts and on falsely created, executed and recorded documents, as was done by Nelson and Frankenberger law firm and Bose McKinney Law Firm to Mains. In Indiana the party who has the rights to receive payments under the Note is the party entitled to seek the remedy of judicial foreclosure in the event of a claimed default under the terms of the Note and Mortgage. That party was falsely claimed to be the WAMU HE-2 Trust in Mains' case. By using the LPS, Chase Bank concealed the identities of the beneficiaries of this scheme from the Borrowers, true Lenders, and the Courts by using an indecipherable series of claimed agents, assignees, successors in interest and "Attorneys in Fact" in the documents it orders from LPS and its affiliated enterprises.

e.  The RICO enterprise participated in by Chase Bank, LPS, Citibank N.A, and its attorney network operated an efficient network of entities who could capitalize

on the scheme they participated in. While top level management would be aware of how the enterprise worked as a whole, lower level employees and document signers (who usually had little or no personal knowledge of the facts asserted in the documents they signed) were used to implement the foreclosure actions on the collateral once sales and insurance payments were exhausted. The less people who knew the full details of the whole scheme, the better.

83.  All named corporate and individual parties were key participants in the RICO enterprise which caused injury to Mains by attempting to deprive him of his real and personal property so that the real scheme, securities fraud and identity theft, could be concealed. The RICO enterprise operated by Chase Bank, Citibank N.A, LPS, and its attorney network operates to conceal the true nature of the "mortgage loans." The use of Mains name, his credit, and personal data to back fraudulent securities offerings in which WAMU, and later Chase Bank, could generate massive profits through multiple sales of the same note and mortgage multiple times, and then collect multiple insurance, credit default swap, and TARP payments upon claimed default was unlawful and predatory. It violated federal law under TILA, RESPA, REG Z, as well as multiple other laws.

84.  Some of the deleterious effects of this and similar enterprises have been documented by regulatory agencies such as the FDIC, OCC, etc., documented in the news, and documented in books covering the financial crisis, effects such as:

   a.  Preventing the affected homeowners from knowing the identity of the real parties in interest to their home loans, and then precluding them from exercising

their rights to defend their homes or recover damages to which they were entitled once the fraud was discovered;

b. Fraudulent confiscation of the real estate interests for the benefit of the "mortgage servicers" for excess payment gained subsequent to the collection of the secondary source payments (i.e, insurance, credit default swaps, TARP, etc.);

c. Loss of local tax revenues;

d. Destabilization of families and communities;

e. The mass human suffering of the victims of these enterprises, who were and continue to be denied recourse for their losses, and compensation for their names, credit, and personal data being used to perpetrate fraud on investors, the government, insurers, and other entities.

85.        Washington Mutual Bank, Chase Bank, and Citibank N.A, all concealed the failure of the participants in the securitization scheme to lawfully and timely convey the assets (such as Mains' Note and Mortgage) which are represented to be the collateral for the offering as in the prospectus for the WAMU HE-2 Trust. In point of fact, the collateral (Such as Mains' Note and Mortgage) has not been lawfully conveyed in the manner and time-frame represented in the Prospectus, Prospectus Supplement and Pooling and Servicing Agreement in hundreds of Real Estate Investment Mortgage Conduit (REMIC) Trusts. Far from the above being a particularly controversial claim as to what has happened routinely with the REMIC trusts, as noted by law professor Adam Levitin of Georgetown University Law Center on November 18, 2010, in testimony he provided to the a U.S. House Subcommittee investigating the mortgage crisis:

"[i]f the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgaged-backed securities, and defendants' failure "ha[d] profound implications for [R]MBS investors."

86.     Professor Levitin noted in his testimony of widespread failures to properly transfer title would appear to provide investors with claims for rescission that could amount to trillions of dollars in claims.

87.     Chase Bank acted in concert with the LPS to order the creation of documents by which it arranged to have Mains' mortgage transferred to the WAMU HE-2 Trust years after its close date. It did this with the knowledge of Citibank as Trustee. The racketeering enterprise described supra relies upon the creation of fictitious documents to make it appear that the Notes and mortgages were lawfully conveyed into the various trusts, such as the WAMU HE-2 Trust, when the collateral was in fact not conveyed as required under New York or Delaware Trust Law or the terms of the PSA. **These attempted transfers also violated 26 U.S.C. § 860D : US Code - Section 860D: REMIC Defined, which requires strict compliance with the requirements of the PSA in order to fund the REMIC trusts as a static entity within three (3) months of the REMIC trusts closing date,** or they are subject to the loss of their income tax exemption, and subject to dissolution for failing to meet REMIC trust requirements.

88.     In Mains' case WAMU (and then later Chase Bank once it had control of REMIC Trust account monies), acted in their own self-interest and for the purported interest of beneficiaries of the mortgage notes. They did so without regard to the interests of the *actual* Lenders of the mortgage notes, i.e, the parties whom actually ended up funding the purchase of mortgage notes in cases like Mains, regardless of what the actual loan documents stated as to the lending party of the notes. It should be

re-iterated, that such non-disclosure of the parties involved in the lending process are complete and utter violations of TILA and RESPA under federal statute. WAMU executed these defective mortgage notes across multiple states and covering multiple REMIC Trusts, which affects countless thousands of loans. The WAMU HE-2 Trust alone has hundreds of mortgage notes from dozens of states contained in it, all of which Chase (and other banks like them acting in Servicer capacity) collect note payments from homeowners without ever disclosing the true "money trail" the borrowers funds go through on the way to the supposed holders of the borrowers notes.

89.     FNF knows, or should have known, that the documents created by LPS employees and its affiliated enterprises are flaws in the chain of title on real estate taken in statutorily defective foreclosures. Both Citibank N.A as Trustee, and Chase Bank knew that the default and acceleration issued to Mains on his note and mortgage, and the subsequent Chase Assignment, were falsely created and executed by employees of LPS or its affiliates, none of whom had authority to execute the assignment by any lawful authority.

90.     Chase Bank and Citibank were motivated to be part of this elaborate enterprise for one reason: financial gain. Chase knew it was necessary to liquidate the collateral once the counterparties to mortgage insurance policies and credit default swaps had paid the maximum recoverable sums in the event of a claimed default, and Chase Bank had recovered many times over on the note balance. It did not disclose this fact to the investors, because Chase Bank controls the fund accounts into which all the loan payments and investor funds are collected and distributed from. To help further obfuscate what had occurred from the investors (such as the investors in the WAMU

43

HE-2 Trust), it would create false assignments and engineered foreclosures to liquidate the collateral in the hope that the investors would be prevented from discovering that the defaulted loan was never lawfully conveyed to the REMIC Trust. The RICO enterprise as described above requires the participation of the Defendants acting in concert to be successful, it operates throughout the United States, and it has damaged countless homeowners and investors alike.

91.     Exhibits 10 and 11 shows the loan details from May 2007 and January 2015. The reports and bondholder reports for the WAMU HE-2 Trust show just how effectively what goes on with the money collected by the Servicers can be hidden from investors and the public. The investors and others receive the above statements, which Citibank conveniently states in the reports (see Exhibit 12) is produced from "3rd parties" and that it "takes no responsibility" and "cannot verify the veracity" of what it has received. This exculpatory language is integral to the Trustees of the multiple REMIC Trusts maintaining their claims of innocence if they are hauled into court regarding accountability to investors (or anyone else) once fraud is discovered as to what actually went on with investors and homeowners money.

92.     Now if this strikes odd, it should, as if one invested money with his stockbroker or in a mutual fund, the last thing one wants to hear is that the information regarding their investments is not verifiable, audited, or accurately accounted for. The reports from exhibits 13 and 14 in Mains' case purports to show the inflows and outflows of money from the WAMU HE-2 Trust. The reports should reflect Note payments from home loans which the WAMU HE-2 Trust investors expect the fund has legal rights to collect on, which are secured by the homes as collateral. Therein lies the rub though, as

the investors get paid what they see reflected on these reports, never knowing if the notes and mortgages supposedly held by WAMU HE-2 Trust are actually held as required by the PSA, never knowing the exact mechanism for their payments. This is exactly why the Trustee's want exculpatory language contained in these statements, because much like Bernie Madoff's accountants, who tried (but failed) to claim they did not know Madoff was committing fraud and that they just reported the numbers **HE** gave them, the Trustee's statement fails for the same reason.

93.      The role of Trustee or accountant is one where certain responsibilities and duties cannot be waived, one where there cannot be claimed to be an ignorance of the facts of, in this case, that knowledge and duty pertains to the investors money, its security in the corpus of the Trust, the trustworthiness of those handling and reporting the funds assets, and the Trustees legal obligations when approving the institution of legal action against those it has claimed has damaged the funds interests. Mains fully intends to see for himself, and the court should demand from the Trustee and Chase Bank, the ***audited*** reports for the WAMU HE-2 Trust, the ***audited*** fund detail reports, and any other direct source detail that is the foundation for the Trustee's claim that it holds Mains' loan, and that the Trust (Not Chase Bank) has been damaged in some manner monetarily. This conversely, is exactly what Citibank and Chase Bank are scared to death of, and exactly what they want no one else to see: That the flow of funds and accounting will reveal fraud and conversion of investor and homeowner funds on a massive scale.

94.      The loan detail statement for January 2015 for Chase Account Number 729863894 states the fund has not lost interest or principal on Mains' loan. The bondholder report from January 2015 does not show Mains' note in default either.

Curious that Citibank has instituted a foreclosure action against Mains, when its own statements for the WAMU HE-2 Trust show investors have lost neither interest or principal on his loan. This begs the question, who has been covering the supposed monetary losses to the Trust then? Where are these monetary losses, and who has suffered them? Most importantly, where is the loan file regarding Mains' Note that might detail these items?  It is only when one starts digging below the surface, as Mains is doing and will continue to do, that the scheme starts to become clear.   Mains contested, and continues to contest, default of any payments due on his Note and Mortgage or that any damages have been suffered by the Trust. He therefore seeks declaratory relief from this court in the form of an accounting directly from the Trust.

95.     Mains also seeks declaratory relief and requests the court use its equitable powers to ensure any amounts found through discovery that have been applied to Mains' loan via Servicer advances, insurance payments, credit default swap payments, TARP payments, etc., which were used to reduce claimed amounts owed to parties under Mains loan, are further granted proper credit to Mains as well. Not doing so would result in unjust enrichment of these parties whomever they may be, and it is not fair for either Chase Bank or the WAMU HE-2 Trust to reap the benefit of any duplicative payment over the ability of the Mains to obtain some of that benefit as is his equitable right.

96.     The defects noted above, the failed attempt to create bearer paper of Mains' "Note", the subsequent void assignment with incorrect instrument type (deed of trust) with unknown purpose, and the final attempted assignment using a robo-signed, robo-notarized, and post-dated document created by LPS in violation of its consent order, all

factually demonstrate that both Citibank and Chase Bank, LPS, and retained counsel N&F, were painfully aware that they lacked standing to have filed any of their state based claims against Mains. If they felt they had any valid claims as to Mains' Note and Mortgage, they should have asked for a reformation of these defects if the courts would have allowed such (and in fact their consent order with the OCC required them to make sure their documents and processes were valid, as further did the LPS settlement agreement and consent order filed with the Indiana attorney general), but apparently this would have proved too much trouble, *or simply impossible.* Fraud was apparently much easier and efficient as a way of avoiding the hassle.

97.        Indiana Statute IC §32-30-10.5-8 does not allow a foreclosure action to take place against a homeowner unless the proper party in interest, capable of negotiating on behalf of the HDC of the borrower's loan, attends the mandatory settlement conference. This statutory violation precludes the issuance of a summary judgment in Mains' case, as it is a condition precedent to foreclosure by statute. The fraud committed on the court by the defendants may have prevented the lower court the ability to issue a foreclosure or notice of Sheriff Sale by statute as a condition precedent. Res Judicata does not bar a review of violations of this statute due to fraud, or from issuing an opinion that the statute was violated in Mains' case. Whether such a ruling would be required to be part of any potential 60(b) motion in state court is another matter, but ruling on whether such a violation occurred is not. Mains was blocked from discovering the fraud that violated the statute until recently due to the Defendants' actions.

98.        The Defendants, by trying to fraudulently foreclose on Mains' mortgage note and seek recovery of money he does not owe them, have illegally clouded Mains' title

to his property and caused monetary damage to Mains in the process. Mains has cured the security issue by notifying any known parties of his decision to rescind his note and mortgage as allowed under TILA effective a of his notice February 27th, 2015 by mail and fax.  See Exhibit 15.

99.      Since required disclosures under TILA were never included in Mains' loan, and the loan could never be properly negotiated without the parties being known, **it remains doubtful the loan transaction was effectively consummated.**

100.        Mains will be forced to quiet title to his property to remove the taint put on it be Defendants' actions. Plaintiff seeks declaratory relief that Plaintiff's title under the mortgage note is superior to that of the Defendants WAMU HE-2 Trust and Chase Bank, due to the fraud and forgery involved. Each and every document upon which the judicial foreclosure sale of Mains' property was initiated with was based on a chain of documents, which as proven above, have forged and undated signatures, are signed by parties with no knowledge of what they were signing or authority to sign them, purport to transfer interests which the parties in the documents do not have to transfer or assign, and these existing and uncorrectable errors make any attempted transfers void and a nullity. This being the case, no party has come forward with a proven title interest superior to that of Mains.

101.      Citibank as Trustee, and Chase Bank acting as purported Servicing agent, also caused false and derogatory information to be put upon Mains' consumer credit bureau reports when it knew that it was not the holder and owner of the Mains' note in violation of 12 USC 1681 s-2 (a) (1) (A). Since Chase Bank knew that Mains was not in default OR past due on his loan payments as to Citibank or the WAMU HE-2 Trust,

they knowingly and illegally slandered Mains financial reputation. The adverse credit reporting is and has adversely effected Mains and caused him immediate harm because he has lost the ability to obtain a lines of credit, car loans, and interfered with his ability to find or retain employment. The above has also prevented him being able to even refinance this very loan because of the above perceived poor credit caused by the acts of Chase Bank colluding with Citibank. Mains seeks relief based on the financial hardship this has caused him, and which will be further quantified through this lawsuit and discovery.

102.    Chase Bank has proven no interest in any of the property owned by the Mains by virtue of WAMU's dissolution and Chase Banks purchase of undisclosed former WAMU assets from the FDIC, and therefore has no right to do what it is doing in trying to collect payment from Mains or foreclose on their mortgage note in the name of agency for Citibank as the alleged Payee on Mains' note. Chase is attempting to take actions in a manner which is not within its authority or within the original expectation of the parties and the promises made when Mains entered into his loan, and is further knowingly colluding with Citibank to affect these actions. Mains therefore seeks a declaration that the way the WAMU HE-2 Trust, and Citibank as it named Trustee, acted in this case as a non-disclosed party claiming an interest in Mains' mortgage loan is deceptive, misleading, and collusory when its actions are coupled with Chase, LPS, and the law firms of Nelson and Frankenberger and Bose McKinney in this matter. This coordinated deception is a violation of civil RICO statutes under Federal law.

103.    Mains and his counsel relied upon the validity of the fictitious documents in evaluating his claims and defenses in 2012 when the summary judgment process was

instituted against him, and through the appeals process They did not begin to suspect that the documents of record were fictitious and contained forgeries and other fraud, and that the Chase Bank Assignment had been prepared by employees of LPS, until December 5, 2014. It was then in preparing the documents for this lawsuit that they discovered Cynthia Riley's deposition from 2013.  It was this discovery which further led him to the names of Jodi Sobotta and Christina Anne Sauerer as known robo-signers for LPS and the whole chain of fraud started to unravel.

104.     This action was commenced within three (3) years of the date upon which Mains suspected the fraudulent filings and was on constructive notice thereof.

105.     This is a complex case, based on the extent of the alleged RICO enterprise formed by the Defendants, and the numerous parties, known and unknown, involved in the RICO enterprise. PLAINTIFF reserves his right to amend this Complaint upon the discovery of new evidence and additional parties in this action. Furthermore, PLAINTIFF reserves his right to amend his pleadings to conform to the proofs at trial.

## CAUSES OF ACTION

### COUNT ONE (1) RESPA –
### Real Estate Settlement Procedures Act

106.     PLAINTIFFS refer to and incorporate by reference herein each and every allegation contained above.

107.     The Real Estate Settlement Procedures Act is found at 12 U.S.C. § 2601-2617., and is implemented by Regulation Z, which is found at 24 C.F.R. § 3500.

108.     Section 2605 states in part:

**(d) Treatment of loan payments during transfer Period**
 During the 60-day period beginning on the effective date of transfer of the servicing of any federally related mortgage loan, *a late fee may not be imposed on the borrower with respect to any*

*payment on such loan* and no such payment may be treated as late for any other purposes, if the payment is received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment.

**(i) Definitions**

For purposes of this section:

(1) Effective date of transfer

The term ''effective date of transfer'' means the date on which the mortgage payment of a borrower is first due to the transferee servicer of a mortgage loan pursuant to the assignment, sale, or transfer of the servicing of the mortgage loan.

(2) Servicer

The term ''servicer'' means the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan). The term does not include—

(3) Servicing

The term ''servicing'' means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

**Section 2607 states in part:**

**§ 2607. Prohibition against kickbacks and unearned fees**

(b) Splitting charges

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

(d) Penalties for violations; joint and several liability; treble damages; actions for injunction by Bureau and Secretary and by State officials; costs and attorney fees; construction of State laws

## SUBPART A

109.     Chase Bank fits the regulatory definition of Servicer for Mains' loan as described above (as opposed to the question of whether it had any *right* to claim it was acting a Servicer contractually, legally, and by right *for* Mains' loan in regards to the WAMU-HE-2 Trust).

110.     Under 2605, subsection (d),  as noticed to Mains in, a change in Servicing to

Chase Bank (again, as defined by Section 2605 above for RESPA purposes) occurred

sometime during the period from late 2008 to May of 2009 for Mains' loan in terms of

Chase Banks accepting payments for Mains' loan and applying payments for the benefit

of Mains' loan. Mains made payment to Chase Bank sometime during the 60 day

transfer period of late 2008 (after the dissolution of WAMU), and by accepting ANY

payments in regards to Mains' loan, and by applying ANY payments made FOR the

benefit of Mains' loan account, Chase was prohibited from charging a late fee OR

treating any such payments as late in regards to Mains' loan if received timely. The

term ANY is very specific in the regulation, as Mains does not have to be the source for

such payments, as long as they were made for the benefit of his loan. Since the PSA for

the WAMU HE-2 Trust states, unequivocally, that payments accepted by the Servicer

for the benefit of the Trust are commingled, credit default swap payments may

be received and applied to accounts, insurance payments received and applied, and any

unknown other payments applied as well, it is unclear at this point as what date(s)

Mains' payments were received by Chase during the 60 day window and applied to his

account, or ANY other payments applied.

111.      Since the statement in exhibit 12 states that the Trustee Citibank does not attest

to the veracity of the data it receives regarding accounting for the Trust, it follows that

until a proper accounting is completed for the loan pool that Chase bank accepts funds

into (including Mains' payments and any other sources) for the benefit of the WAMU

HE-2 Trust, and it can be clearly understood by what method Chase was accepting and

distributing funds for the benefit of the WAMU HE-2 Trust, Mains' loan cannot be said

to be late as to payments, or late fee's charged until a proper accounting is ordered by

the court. Given the evidence of conduct Mains has described in his complaint, Mains

seeks damages as allowed under 2605(f) for violations of RESPA in regards to the

treatment of his payments during the 60 day period described in subsection (d).

## SUBPART B

112.     Due to the conduct of Defendants WAMU and Citigroup as outlined in Mains'

Complaint, Mains is seeking damages for violations of 2607(b), as WAMU charged

Mains for services it did not validly render or account for when it closed on Mains' loan

transaction. Due to undisclosed investor funds being used WAMU knew it was

violating TILA and RESPA disclosures. WAMU did not account properly for the way it

charged Mains for the closing costs or distributed Mains' funds to others, because

the services it claimed it or others rendered became nullities or ineffective due to the

violations (in particular any "loan review" fee's charged for the closing, attorney fee's,

etc., since WAMU knew these services were effectively shams due to its fraud). Mains

realizes his claims for these charges will require specificity, but this will come through

further discovery and evidence provided as his case proceeds, and as he is able to go

back over his closing statement to match services "claimed" with what was actually and

validly rendered.

## Equitable Tolling

113.     The fraud in Mains case only recently came to Mains attention, and equitable

tolling as to RESPA violations has been recognized by the circuit courts. See in

particular the recent decision in *Merritt v Countrywide* from the 9th circuit, on page 30

of that decision filed 7/16/14:

"The presumption of equitable tolling applies As the RESPA limitations period is not jurisdictional, RESPA claims are presumptively amenable to equitable tolling, see Irwin, 489 U.S. at 95, unless Congress has clearly indicated otherwise. There is no such indication in the statute. Many of the considerations on which we relied as to the jurisdictional issue, particularly the permissive language used in the limitations provision, also help to negate any clear barrier to equitable tolling. In addition, we are guided by the analysis in King, 784 F.2d 910, which applied an approach with respect to equitable tolling generally consistent with the recent cases. King's logic with regard to the TILA limitation period applies equally to the parallel RESPA provision."

114.    Equitable tolling should apply in Mains' case as well, given the egregious nature of the violations involved and fraud knowingly concealed by the Defendants from Mains, and not discovered by him until recently.

### Request for Declaratory Relief

115.    Since damages will be determined by an accounting, and such an accounting is required in regards to other of Mains counts as well, Mains also asks for declaratory relief as follows from the court:

    a.  An accounting for any of the pooled funds Chase Bank accepted, or accepts payments into, for the benefit of the WAMU HE-2 Trust,

    b.  An accounting of when the transfer of Mains payments became effective as to Chase accepting them for the benefit of the WAMU HE-2 Trust

    c.  Access to any records, files, or Audits in relation to the pooled fund(s) described in "a.) " so that Mains and the court are satisfied as to understanding the flows of funds within this pool, and how they were applied as to Mains and the WAMU HE-2 Trust, and others.

    d.  To the extent that Chase Bank, Citibank, or the WAMU HE-2 Trust were

unjustly enriched as to ANY payments received and accepted in regards to

Mains Note and Mortgage, OR by the use of Mains identity, credit history,

social security number, and personal data to procure such payments are

unbeknownst to Mains or the court, Mains seeks any credit due him for such

payments, or a disgorgement of said payments, as the court finds fit.

## COUNT TWO (2)

### The Truth in Lending Act (TILA), 15 U.S.C. 1601 et seq.,
### Federal Truth
### In Lending Act, 15 U.S.C. § 1641(g)
### Violations of TILA and Regulation Z

116.    PLAINTIFFS refer to and incorporate by reference herein each and every

allegation contained above.

117.    Under TILA, 15 U.S.C. §§ 1601-1666j, and its implementing Regulation Z, 12

C.F.R. § 1026, creditors who extend "closed-end credit," as defined in 12 C.F.R. §

1026.2(a)(10), must comply with the applicable disclosure provisions of TILA and

Regulation Z, including, but not limited to, Sections 1026.17 and 1026.18 of Regulation

Z, 12 C.F.R. §§ 1026.17 and 1026.18.

118.         "Creditor" means a person who regularly extends consumer credit that is

subject to a finance charge or is payable by written agreement in more than four

installments (not including a down payment), and to whom the obligation is initially

payable, either on the face of the note or contract, or by agreement when there is no

contract. 12 C.F.R. § 1026.2 (a)(17). Defendants WAMU, Chase Bank as listed

successor to WAMU, are creditors under TILA and Regulation Z because they extend

consumer credit subject to a finance charge and Mains note obligation was listed as

initially payable to WAMU.

119.        Sections 121(a) and 128(b)(1) of TILA, 15 U.S.C. §§ 1631(a) and

1638(b), and Sections 1026.17(a) and (b) and Section 1026.18 of Regulation Z, 12

C.F.R. §§ 1026.17(a) and (b) and 1026.18, require creditors of closed-end consumer

credit transactions to disclose, before the credit is extended, among other things, the

following about the loan: finance charge; annual percentage rate; number, amount, and

due dates or period of payments scheduled to repay the total of payments (i.e., the

"scheduled payment(s)"); and total of payments. These disclosures must reflect the

terms of the legal obligation between the parties. 12 C.F.R. § 1026.17(c).

120.        Section 1635 of TILA provides in relevant part the following:

> (a) Except as otherwise provided in this section,
> in the case of any consumer credit transaction ...
> in which a security interest ... is or will be
> retained or acquired in any property which is
> used as the principal dwelling of the person to
> whom credit is extended, the obligor shall have
> the right to rescind the transaction until midnight
> of the third business day following the
> consummation of the transaction or the delivery
> of the information and rescission forms required
> under this section together with a statement
> containing the material disclosures required
> under this subchapter, whichever is later, by
> notifying the creditor, in accordance with
> regulations of the Board, of his intention to do
> so....
>
> (b) When an obligor exercises his right to rescind
> under subsection (a) of this section, he is not
> liable for any finance or other charge, and any
> security interest given by the obligor, including
> any such interest arising by operation of law,
> becomes void upon such rescission. Within 20
> days after receipt of a notice of rescission, the
> creditor shall return to the obligor any money or
> property given as earnest money, downpayment,
> or otherwise, and shall take any action necessary

or appropriate to reflect the termination of any security interest created under the transaction. *If the creditor has delivered any property to the obligor, the obligor may retain possession of it.* Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, *except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value.* Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by the court....

(f) An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first....

(g) In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.

**15 U.S.C. § 1635. Section 1640 provides in relevant part the following:**

(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of-

**(1) any actual damage sustained by such person as a result of the failure;**

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection

with the transaction, ... except that the liability under this subparagraph shall not be less than $ 100 nor greater than $ 1,000 ...; and

*(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court.*

121.     In numerous instances, Defendants WAMU, Chase Bank, and Citibank N.A as Trustee for the WAMU HE-2 Trust have violated the requirements of TILA and Regulation Z as noted in Mains' Complaint.

122.     As discussed Supra in this complaint, In addition to misrepresenting the terms of the Mains loan, WAMU never disclosed adequately the terms of the loan as actually structured. Mains rescinded his loan effective February 27, 2015 by giving proper notice as required under TILA. The Defendants whom are required to respond within 20 days of the notice as claimed creditors and owners of his loan have failed to do so, effectively waiving rights they might claim.

123.     Defendant WAMU failed to provide Plaintiff Mains with the requisite disclosures before depositing the funds used to purchase Mains residence with Seller of the home. As a result, whether or not Mains authorized the " loan", Defendant WAMU failed to provide Mains with required disclosures about the purported loan's terms, who the actual party/Parties were that provided the funds for purchase of his residence (The True Lender(s)), the legal obligations that resulted from the undisclosed True Lender being part of the loan contract, and any fees or other compensation that were agreed upon between the undisclosed True Lender of Mains loan and WAMU. There can be no doubt that the negotiations between WAMU and the undisclosed True Lenders

materially affected the interest rate and fees ultimately charged to Mains, affected his ability to negotiate or modify his loan contract terms, and resulted in Mains payments, credit, and good name being used in a scheme that was further used to defraud Mains and others.

124.     As a result of these actions, WAMU unjustly enriched itself by extracting significantly higher payments from Mains than they represented in the prominent terms of the Loan Disclosures through passing on the costs of the undisclosed relationship into Mains loan. The result was a loan transaction that was predatory per se due to these non-disclosures and table funding aspects , and in violation of RESPA and REG Z which define these types of loans as predatory loans.

## SUBPART A
### Violations of Mortgage Servicing Rules under TILA

125.     Under 12 CFR 1026.36(c)(1) regarding processing of payments to a consumers loan account for a consumer credit transaction secured by a consumer's principal dwelling, a loan servicer cannot fail to credit a periodic payment to the consumer's loan account as of the date of receipt, except in instances when the delay will not result in a charge to the consumer or in the reporting of negative information to a consumer reporting agency.

126.     Note: For the purposes of 12 CFR 1026.36(c), a periodic payment is "an amount sufficient to cover principal, interest, and escrow for any given billing cycle." If the consumer owes late fees, other fees, or non-escrow payments but makes a full periodic payment, the servicer must credit the periodic payment as of the date of receipt.

127.     Providing Payoff Statements—12 CFR 1026.36(c)(3)  For consumer credit transactions secured by a dwelling, including HELOCs under 12 CFR 1026.40(a), a

creditor, assignee, or servicer may not fail to provide, within a reasonable time, but no more than seven business days, after receiving a written request from the consumer or person acting on behalf of the consumer, an accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specific date.

128.    Notification of Sale or Transfer of Mortgage Loans—12 CFR 1026.39

129.    Notice of new owner: No later than 30 calendar days after the date on which a mortgage loan is acquired by or otherwise sold, assigned, or otherwise transferred  to a third party, the "covered person" shall notify the consumer clearly and conspicuously in writing, in a form that the consumer may keep, of such transfer and include

130.    • identification of the loan that was sold, assigned, or otherwise transferred;

131.    • name, address, and telephone number of an agent or party having authority, on behalf of the covered person, to receive notice of the right to rescind and resolve issues concerning the consumer's payments on the mortgage loan;

132.    This notice of sale or transfer must be provided for any consumer credit transaction that is secured by the principal dwelling of a consumer.  This notification is required of the covered person even if the loan servicer remains the same.

133.    Regulation Z also establishes special rules regarding the delivery of the notice when there is more than one covered person.

134.    Periodic Statements for Residential Mortgage Loans—12 CFR 1026.41:

> Creditors, assignees, or servicers of closed-end mortgages are generally required to provide consumers with periodic statements for each billing cycle. Periodic statements must be provided by the servicer within a reasonably prompt time after the payment is due, or at the end of any courtesy period provided by the servicer for the previous billing cycle. Servicers must provide consumers with

the following information in the specified format on the periodic statements: The Amount Due ... the payment due date; the amount of any late payment fee; the date that late payment fees will be assessed to the consumer's account if timely payment is not made; and the amount due, which must be shown more prominently than other disclosures on the page... an explanation of the amount due, including the monthly payment amount with a breakdown of how much will be applied to principal, interest, and escrow; the total sum of any fees and charges imposed since the last statement; and any payment amount past due...Past Payment Breakdown, the total of all payments received since the last statement and the total of all payments received since the start of the calendar year, including, for each payment, a breakdown of how the payment(s) was applied to principal, interest, escrow, fees and charges, and any amount held in a suspense or unapplied funds account (if applicable)...Transaction Activity...A list of transaction activity (including the date, amount, and brief description of each transaction) for the current billing cycle, including any credits or debits that affect the current amount due... Account information, including the outstanding principal balance, the current interest rate, the date after which the interest rate may change if the loan is an ARM, and any prepayment penalty, Delinquency Information...Servicers must provide consumers who are more than 45 days delinquent on past payments with additional information regarding their accounts on their periodic statements. These items must be grouped together in close proximity to one another on the first page or a separate page with the periodic statement or in a separate letter and must include the date on which the consumer became delinquent a notification of the possible risks of being delinquent, such as foreclosure and related expenses an account history for either the previous six months or the period since the last time the account was current (whichever is shorter), which details the amount past due from each billing cycle or, if any such payment was fully paid, the date on which payments were credited to the account as fully paid • a notice stating whether the servicer has initiated a foreclosure process• total payments necessary to bring the account current.

135.     WAMU further violated TILA by setting up a system whereby WAMU collected loan payments from Mains in the guise of being a Servicer for his loan for the WAMU HE-2 Trust when this was in fact false. Both WAMU and Citibank as Trustee for the Trust, knew the loan had not been correctly paid for or transferred to the WAMU

HE-2 Trust, yet WAMU still collected payments from Mains and issued "loan" servicing statements that contained false information regarding a loan that was never transferred to the WAMU HE-2 Trust, and which the Trust had no rights to or held as holders in due course or otherwise. Each of the loan statements sent to Mains by WAMU (and later Chase Bank as it took over the sham title of Servicer for Mains loan) were in violation of, and damaged Mains by :

    e.  12 CFR 1026.36(c)(1), for mishandling Mains loan payments when it had no right to be receiving his payments or servicing them.

    f.  12 CFR 1026.36(c)(3), for giving Mains and his attorney false information regarding payoff on Mains loan which they had no right to be servicing, did not reflect accurate pay off information as all credits and debits to Mains loan were not accounted for (insurance payments, TARP funds, credit default swap payments, etc.), and as noted above the payments were mishandled.

    g.  12 CFR 1026.39, for failing to provide accurate information regarding who was the actual holder of Mains loan, and when it was transferred, and whom the correct contact was or is, as requested by Mains multiple times in interrogatories and information requests to Nelson and Frankenberger, Chase Banks listed counsel through Blacknight Financial Services (formerly LPS).

    h.  12 CFR 1026.41, for providing periodic statements which contained false information from Chase Bank regarding a loan that they were not a legitimate Servicer for, and which failed in all respects to provide accurate information regarding the true status of Mains loan, which Chase Bank knew to be false, as well as Defendants Citibank N.A as trustee for the WAMU HE-2 Trust.

136.     By intentionally misguiding Mains and his attorney through the above violations

in Counts II & III, Mains was subject actual damages in the form of emotional distress

which resulted loss of consortium with his spouse, led to a divorce from his spouse, loss

of income and increased living expenses due to said divorce, hospitilization due to

stress and attendant medical bills; attorneys fees in trying to resolve claims related to

this false information, and other pecuniary damages.

### PRAYER FOR RELIEF

137.     Wherefore, Plaintiff requests that the Court:

i.   Award Plaintiff such preliminary injunctive and ancillary relief as may be

necessary to avert the likelihood of further injury to Plaintiff during the pendency

of this action and to preserve the possibility of effective final relief, including but

not limited to, temporary and preliminary injunctions and order freezing assets.

j.   Award such relief as the Court finds necessary to redress injury to Plaintiff

resulting from Defendants' violations of TILA and its implementing Regulation

Z; including but not limited to, rescission or reformation of contracts, restitution,

the refund of monies paid, and the disgorgement of ill gotten monies; and

k.   D. Award Plaintiff the costs of bringing this action, actual damages suffered, as

well as such other and additional relief as the Court may determine to be just and

proper.

### COUNT THREE (3)
### Sec. 3500.1 Designation and applicability. Indiana Version=
### IC 32-30-10.5 Chapter 10.5. Foreclosure Prevention Agreements for Residential
### Mortgages

138.     PLAINTIFFS refer to and incorporate by reference herein each and every allegation contained above.

139.     IC 32-30-10.5-8 Presuit notice; contents; notices by creditor and court of debtor's right to settlement conference; debtor's contact information; notice to insurance company; exceptions; form of notice

Sec. 8. (a) This section applies to a foreclosure action that is filed after June 30, 2009. Except as provided in subsection (e) and section 10(g) of this chapter, not later than thirty (30) days before a creditor files an action for foreclosure, the creditor shall send to the debtor by certified mail a presuit notice on a form prescribed by the authority. The notice required by this subsection must do the following:

(1)       Inform       the       debtor       that:
(A)       the       debtor       is       in       default;
(B) the debtor is encouraged to obtain assistance from a mortgage       foreclosure       counselor;       and
(C) if the creditor proceeds to file a foreclosure action and obtains a foreclosure judgment, the debtor has a right to do the following       before       a       sheriff's       sale       is       conducted:
(i) Appeal a finding of abandonment by a court under IC 32-30-10.6.
(ii) Redeem the real estate from the judgment under IC 32-29-7-7.
(iii) Retain possession of the property under IC 32-29-7-11(b), subject to the conditions set forth in IC 32-29-7-11(b).
(2) Provide the contact information for the Indiana Foreclosure       Prevention       Network.
(3) Include the following statement printed in at least 14 point boldface       type:
"NOTICE       REQUIRED       BY       STATE       LAW
Mortgage foreclosure is a complex process. People may approach you about "saving" your home. You should be careful about any such promises. There are government agencies and nonprofit organizations you may contact for helpful information about the foreclosure process. For the name and telephone number of an organization near you, please call the Indiana       Foreclosure       Prevention       Network.".
(b) The notice required by subsection (a) shall be sent to:
(1)       the       address       of       the       mortgaged       property;       or
(2) the last known mailing address of the debtor if the creditor's records indicate that the mailing address of the debtor is

other than the address of the mortgaged property. If the creditor provides evidence that the notice required by subsection (a) was sent by certified mail, return receipt requested, and in accordance with this subsection, it is not necessary that the debtor accept receipt of the notice for an action to proceed as allowed under this chapter.

(c) Except as provided in subsection (e) and section 10(g) of this chapter, if a creditor files an action to foreclose a mortgage, the creditor shall:

(1) in the case of a foreclosure action filed after June 30, 2009, but before July 1, 2011, include with the complaint served on the debtor, on a form prescribed by the authority; and

(2) subject to subsection (f), in the case of a foreclosure action filed after June 30, 2011, include on the first page of the summons that is served on the debtor in conjunction with the complaint; a notice that informs the debtor of the debtor's right to participate in a settlement conference, subject to section 9(b) of this chapter. The notice under subdivision (1) or (2) must inform the debtor that the debtor may schedule a settlement conference by notifying the court, not later than thirty (30) days after the complaint is served on the debtor, of the debtor's intent to participate in a settlement conference.

(d) If a creditor files an action to foreclose a mortgage, the creditor shall do the following:

(1) Include with the complaint filed with the court:

(A) except as provided in subsection (e) and section 10(g) of this chapter, a copy of the notices sent to the debtor under subsections (a) and (c), if the foreclosure action is filed after June 30, 2009, but before July 1, 2011; or

(B) the following, if the foreclosure action is filed after June 30, 2011:

(i) Except as provided in subsection (e) and section 10(g) of this chapter, a copy of the notice sent to the debtor under subsection (a).

(ii) The following most recent contact information for the debtor that the creditor has on file: all telephone numbers and electronic mail addresses for the debtor and any mailing address described in subsection (b)(2). The contact information provided under this item is confidential under IC 5-14-3-4(a)(13).

(2) For a foreclosure action filed after June 30, 2011, at the time the complaint is filed with the court, send:

(A) by certified mail, return receipt requested; and

(B) to the last known mailing address of the insurance company;

a copy of the complaint filed with the court to the insurance

company of record for the property that is the subject of the foreclosure                                                    action.
It is not necessary that the insurance company accept receipt of the copy of the complaint for the creditor to satisfy the requirement of subdivision (2). A creditor's failure to provide a copy of the complaint as required by subdivision (2) does not affect the foreclosure action or subject the creditor to any liability. Subject to section 9(b) of this chapter, in the case of a foreclosure action filed after June 30, 2011, upon the filing of the complaint by the creditor, the court shall send to the debtor, by United States mail and to the address of the mortgaged property, or to an address for the debtor provided by the creditor under subdivision (1)(B)(ii), if applicable, a notice that informs the debtor of the debtor's right to participate in a settlement conference. The court's notice must inform the debtor that the debtor may schedule a settlement conference by notifying the court of the debtor's intent to participate in a settlement conference. The court's notice must specify a date by which the debtor must request a settlement conference, which date must be the date that is thirty (30) days after the date of the creditor's service of the complaint on the debtor under subsection (c), as determined by the court from the service list included with the complaint filed with the court. The court may not delegate the duty to send the notice the court is required to provide under this subsection to the creditor or to any other                                                            person.

(e) A creditor is not required to send the notices described in this section                                                              if:

(1) the mortgage is secured by a dwelling that is not occupied by    the    debtor    as    the    debtor's    primary    residence;

(2) the mortgage has been the subject of a prior foreclosure prevention agreement under this chapter and the debtor has defaulted with respect to the terms of that foreclosure prevention agreement;                                                                   or

(3) bankruptcy law prohibits the creditor from participating in a settlement conference under this chapter with respect to the mortgage.

(f) Not later than June 1, 2011, the authority, in consultation with the division of state court administration, shall prescribe language for the notice required under subsection (c)(2) to be included on the first page of the summons that is served on the debtor in a foreclosure action filed after June 30, 2011. The language must convey the same information as the form prescribed by the authority under subsection (c)(1) for foreclosure actions filed after June 30, 2009, but before July 1, 2011. The authority shall make the language prescribed under this subsection available

on the authority's Internet web site. A creditor complies with subsection (c)(2) in a foreclosure action filed
after June 30, 2011, if the creditor includes on the first page of the summons served on the debtor:
    (1) the language that is prescribed by the authority under this subsection and made available on the authority's Internet web site; or
    (2) language that conveys the same information as the language that is prescribed by the authority under this subsection and made available on the authority's Internet web site.
*As added by P.L.105-2009, SEC.20. Amended by P.L.68-2010, SEC.3; P.L.170-2011, SEC.8; P.L.116-2011, SEC.4; P.L.6-2012, SEC.212; P.L.102-2012, SEC.2.*

140.    Indiana Statute IC §32-30-10.5-8 does not allow a foreclosure action to take place against a homeowner unless the proper party in interest, capable of negotiating on behalf of the HDC of the borrower's loan, attends the mandatory settlement conference. This statutory violation precludes the issuance of a summary judgment in Mains' case, as it is a condition precedent to foreclosure by statute. The fraud committed on the court by the defendants may have prevented the lower court the ability to issue a foreclosure or notice of Sheriff Sale by statute as a condition precedent. Res Judicata does not bar a review of violations of this statute due to fraud, or from issuing an opinion that the statute was violated in Mains' case. Whether such a ruling would be required to be part of any potential 60(b) motion in state court is another matter, but ruling on whether such a violation occurred is not. Mains was blocked from discovering the fraud that violated the statute until recently due to the Defendants' actions.

141.    PLAINTIFFS seek a declaratory judgment Defendants have violated IC IC 32-30-10.5-8.

## COUNT FOUR (4)

**Negligent and/or Intentional Infliction of Emotional Distress
Against Chase and Citibank as Trustee for the WAMU HE-2 Trust by
way of SUPPLEMENTAL JURISDICTION via 28 U.S. Code § 1367**

142.     PLAINTIFFS refer to and incorporate by reference herein each and every allegation contained above.

143.     The above conduct was negligent or intentional on the part of defendants, or their agents or representative for which they are responsible.

144.     That the Mains suffered severe emotional distress which ultimately led to their divorce, and the hospitalization of Mains for high blood pressure brought on by stress.

145.     That defendants' conduct was a substantial factor in causing the Mains severe emotional distress.

146.     It is believed that the activity and conduct alleged throughout this complaint is the deliberate attempt by Defendants to destroy the credit or interfere with their property ownership including their peaceful enjoyment thereof and is actionable.

147.     Such conduct is oppressive, fraudulent and malicious and justified punitive damages.

148.     This Court has supplemental jurisdiction to consider Plaintiffs' claim for intentional infliction of emotional distress because the claim forms part of the same controversy as the federal claims. 28 U.S.C. § 1367(a). The claim also passes Rooker-Feldman test because it asserts a Claim for relief outside the scope of the state court judgment.

149.     Loss of time at job to deal with depression, anxiety which affected his job and family life.

## COUNT 5
## Negligent Misrepresentation

150.         PLAINTIFFS refer to and incorporate by reference herein each and

every allegation contained above.

151.         Against Chase and the Trust and Citibank as Trustee es VI-X

PLAINTIFFS refer to and incorporate by reference herein each and every allegation

contained above.

152.         "'[n]egligent misrepresentation may be actionable and inflict only economic

loss[,]'" citing Restatement (Second) of Torts § 552. Greg Allen Constr. Co., Inc. v.

Estelle, 798 N.E.2d 171, 174 (Ind. 2003). Restatement (Second) of Torts § 552(1),

entitled Information Negligently Supplied for the Guidance of Others, provides:

> One who, in the course of his business, profession or
> employment, or in any other transaction in which he has a
> pecuniary interest, supplies false information for the guidance
> of others in their business transactions, is subject to liability for
> pecuniary loss caused to them by their justifiable reliance upon
> the information, if he fails to exercise reasonable care or
> competence in obtaining or communicating the information.

*Tri-Professional Realty v. Hillenburg*, 669 N.E.2d 1064, 1068-1069, 1996 Ind. App.
LEXIS 1146, 11-     12 (Ind. Ct. App. 1996)

153.       Citibank, WAMU, Chase and their agents as the owners, and controllers of the

note and security, or its agents are responsible for the loan process described herein

which the Mains took part. As part of that and to induce the Mains' participation, these

Defendants or their agents or predecessors falsely represented to Mains the character of

the transaction, the parties for whom he should make loan payments to, how his

payments would be handled and applied and their security interest in Mains' home.

154.     That the above representation was and is not true;

155.     That Defendants' or their agents or predecessors may have believed that the representation was true, but they had no reasonable grounds for believing the representation was true when they made it.

156.     That Defendants or their agents or predecessors intended that the Mains rely on this representation.

157.     That the Mains reasonably relied on Defendants', their agents' or predecessors' representation in the above regard.

158.     That the Mains were harmed by making payments to incorrect parties, that their payments were not applied to the Mains' benefit, that Defendants were unjustly enriched to the Mains' detriment.  Mains incurred legal costs, loss of wages from time off from work and dealing with this and medical costs.

159.     That the Mains' reliance on Defendants or their agents or representation was a substantial factor in causing this harm to them.

160.     PLAINTIFFS seek all damages and equitable relief allowed by law, Attorney fees and costs occasioned by the above stated conduct.

161.     PLAINTIFFS seek all damages and equitable relief allowed by law, attorney fees and costs occasioned by the above stated conduct.

## COUNT 6
## INDIANA COMMONW LAW FRAUD

162.     PLAINTIFFS refer to and incorporate by reference herein each and every allegation contained above.

163.     The elements of actual fraud are: (1) a material representation of past or existing

facts which; (2) was false; (3) was made with knowledge or reckless ignorance of falsity; (4) was made with intent to deceive; (5) was rightfully relied upon by the complaining party and; (6) proximately injury to the complaining

164.     Defendants made a material representation that Defendants legally owned the promissory note and mortgage when in fact Defendants did not, and were not entitled to the payments made by Mains to them.

165.     Defendants had knowledge or were reckless, or ignorant to the fact that Defendants did not and does not legally own an alleged debt of the Plaintiff.

166.     Based on Defendants and Defendants' agent's telephone calls, dunning letters, credit bureau reporting's, and robo-signed affidavits, as well as other inducing evidence such as old statements, computer printouts, and failure to notify Plaintiffs of securitization, the Plaintiffs legitimately relied upon the misrepresentation herein made by Defendants to Plaintiffs' detriment by paying money to Defendants.

167.     Defendants intended to deceive each Plaintiff into believing that Defendants were collecting on legitimate debts by designing and implementing a collection process that gave Defendants the appearance of their ownership of the debt.

168.     Defendants intended to deceive Plaintiffs, their counsel, and the Legal System that Defendants had standing to bring legal process to collect money from Plaintiffs using solely information it purchased with no legal debt ownership.

169.     Defendants' scheme, deceitful threats, legal process, and collection of money from Plaintiffs proximately caused damage to Plaintiffs' privacy, credit ratings, employment, loss of money, and consequential harm.

170.     Said activity also set the Mains up for allowing their credit to be utilized to

obtain a warehouse loan which was shopped and traded by multiple persons and entities who allegedly placed them into a securitized loan pool without their knowledge, consent or best interest (in fact it was against their interest).

171.    These above named Defendants misrepresented who they were, what they were doing and the role they played in the above-mentioned transaction.

172.    The scheme, as described in this Complaint brought all sorts of issues into the contractual relationship which were not explained and were in fact, concealed.

173.    In the alternative, it is alleged that Citibank to surreptitiously, purposely and intentionally tricked the Mains into defending against a lawsuit claiming that it was a controlling entity in the transaction by colluding with Chase Citibank became involved in and wreak havoc on the Mains, their finances, lives and property.

174.    Black Knight, aka LPS's, collusion and use of its software system allowed the misuse of information, records and the title to the property and to wrongfully control and interfere with the Mains right to quiet  enjoyment of the property, all of which happened here with a vengeance.  Black Knight knew that there were material facts concealed from the Mains and that the average borrower would have no idea what was going on without an explanation. In spite of this, the Defendants, including Nelson and Frakenberger, failed to provide a explanation or provide minimal disclosures as required by law. That these defendants actively concealed these important facts from the Mains or prevented them from discovering that fact.

175.    Without such an explanation, the Mains were deceived by these Defendants.

176.    The Mains justifiably relied on the facts.

177.    The Mains suffered substantial harm and damage by reason of the above

wrongful acts of Defendants as described herein.

178.     PLAINTIFFS seek all damages and equitable relief allowed by law, attorney

fees and costs occasioned by the above stated conduct.

179.     The acts and omissions of the DEFENDANTS were performed with fraud,

oppression and malice, so as to justify an award of punitive damages, according to proof

at trial.

## COUNT 7
### Negligence on all Defendants

180.     PLAINTIFFS refer to and incorporate by reference herein each an every

allegation contained above.

181.     Defendants have been negligent throught this matter as described herein.

182.     Defendants held themselves as servicers, or parties in interest to Mains'

transaction, with the Mains as their customers. As a result, Defendants' falsely created a

customer relationship with Defendant.

183.     Plaintiff contend and allege that Defendants were negligent throughout the

handling of Mains' loan payments, reporting of his transaction and the foreclosure

process.

184.     That the Mains were harmed as a direct result of the above.

185.     That the negligence was a substantial factors in causing the Mains' harm.

186.     PLAINTIFFS seek all damages and equitable relief allowed by law, attorney

fees and costs occasioned by the above stated conduct.

## COUNT 8
### Fair Debt Collection Practices Act

187.      PLAINTIFFS refer to and incorporate by reference herein each and every allegation contained above.

188.      Under The Fair Debt Collection practices Act, as codified by 15 U.S.C. §§1692-1692p, debt and debt collector is defined as follows:

189.      **15 U.S. Code § 1692a - Definitions**

(5)The term "debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, **property,** insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

(6)The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, *or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.* Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. The term does not include—

(A)any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

(B)any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts;

(C)any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties;

(D)any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt;

(E)any nonprofit organization which, at the request of consumers, performs bona fide consumer credit counseling and assists consumers in the liquidation of their debts by receiving payments from such consumers and distributing such amounts to creditors; and

(F)any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity

(i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement;

(ii) concerns a debt which was originated by such person;

(iii) concerns a debt which was not in default at the time it was obtained by such person; or

(iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

190.     Chase Bank, Blacknight Financial Services (formerly LPS), Nelson and

Frankenberger, and Bose McKinney all meet the regulatory definition of debt collectors

under 1692(a)6 as entities "who uses any instrumentality of interstate commerce or the

mails in any business the principal purpose of which is the collection of any debts, or

who regularly collects or attempts to collect, directly or indirectly, debts owed or due or

asserted to be owed or due another." They engaged  in their multiple and continuing

attempts to collect upon Mains note and mortgage prior to and post rescission,  conduct

which were distinct events  and separate violations of the FDCPA due to prohibited

nature of the conduct under the act as will further be clarified below. Chase Bank and

Nelson and Frankenberger specifically identify themselves as "Debt Collectors" as

defined by the FDCPA in their notices (See exhibits 3 and 16) in trying to collect or

negotiate amounts they claim due from Mains, and law firms in engaged regularly in debt

collection are held to be under the purvey of the FDCPA as noted in multiple decisions

from various circuit courts. Blacknight Financial Services, as the undisclosed agent for

Chase Bank in:  a.) contracting for b.) providing their computer software and forms for c.) and directing the debt collection attempts of Nelson and Frankenberger and Bose McKinney (and dozens of other law firms across multiple other states) falls under the definition of debt collector as well, as the language of 1692(a) makes clear even indirect attempts qualify as debt collection. Chase Bank similarly cannot claim exemption under any of the sections of 1692(f), as Mains debt was, as represented by them, in default at the time they took over servicing rights from WAMU on Mains loan. Blacknight, N&F, and Bose all acted in agency with Chase. Further, they acted in the capacity of debt collector (s) for the represented owner, the WAMU HE-2 Trust, as Servicer and agents in trying to collect money and property from Mains, using communications via Mail, fax, and wire crossing interstate lines, and in coordination with one another. (For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

191.     As debt collector(s) as defined above, all the Defendants mentioned above must comply with the applicable sections of 15 U.S.C. §§1692-1692p including, but not limited to.

### 15 U.S. Code § 1692c - Communication in connection with debt collection-provides in relevant parts as follows:

(b) Communication with third parties

Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a post judgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise

permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

(c) Ceasing communication

If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except—

(1) to advise the consumer that the debt collector's further efforts are being terminated;

(2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

(3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

If such notice from the consumer is made by mail, notification shall be complete upon receipt.

**Section 1692(e) - False or Misleading Representations- provides in relevant part the following:**

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.

(2) The false representation of—

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages

of any person unless such action is lawful and the debt collector or creditor intends to take such action.

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

**Equitable Tolling**

192.     Plaintiff notes that normal statutory enforcement for FDCPA provisions is within one year of the occurrence, which is within the parameters of count II as a separate and distinct event. Conduct past one year is still enforceable under the FDCPA under equitable tolling, if the court finds that the defendant concealed from Mains the existence of his cause of action; (2) he remained in ignorance of that cause of action until some length of time within the statutory period before commencement of his action; and (3) his continuing ignorance was not attributable to lack of diligence on his part. See *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.1988); see also *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349–50, 22 L.Ed. 636 (1874).

193.     Further, other circuits have held that FDCPA claims are subject to equitable tolling. *Somin v. Total Cmty. Mgmt. Corp.*, 494 F.Supp.2d 153, 158 (E.D.N.Y.2007) (citing Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir.1996)). To invoke this doctrine, a plaintiff must allege that extraordinary circumstances prevented him from acting in a timely manner. See *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir.1996). Generally, equitable tolling applies only where defendant has engaged in conduct to conceal wrongdoing and, as a result, plaintiff fails to discover facts giving rise to the claim, despite the exercise of reasonable diligence. *Coveal v. Consumer Home Mtge., Inc.*, 2005 WL 704835 *4 (E.D.N.Y.2005); see *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir.2002).

194.     Finally, equitable tolling may apply even when defendant did not actively conceal anything. In *Coble v. Cohen & Slamowitz*, LLP, the plaintiff argued that the defendants actively and knowingly concealed the fact that affidavits and attorney affirmations referencing plaintiff were false and improper. *Coble v. Cohen & Slamowitz*, LLP; 824 F.Supp.2d 568; S.D.N.Y.,2011 . (The defendants argued that they did not engage in fraudulent concealment because they had done nothing to conceal the affidavit in question and the prior litigation against them was public knowledge and since the information was on PACER, the plaintiff could have discovered the violation if they were diligent. Id. At 572. However, the court reasoned that searching on PACER would not reflect the practices of a reasonably diligent consumer and thus ruled in favor of the plaintiff). Id (citing *Thompson v. Metro. Life Ins. Co.*, 149 F.Supp.2d 38, 52 (S.D.N.Y. 2001), media coverage and prior lawsuits are not sufficient to establish that plaintiffs should have known of their injuries).

195.     Such is the case regarding the Defendants in Mains case. Per their conduct in paragraph xx, Mains was not aware of LPS involvement in his case, or that the forged signature of Cynthia Riley was an issue until the publication of her deposition caught his attention. Defendants outrageous conduct in this case was compounded by the fact that Mains case was halted for 2 years due to the conduct of LPS directly, that upon re-instatement of their actions against Mains Defendants never attempted to correct the fraud or forgeries they knew to exist, or notify the court of as was their duty to do, and yet STILL proceeded to try and collect debt from Mains they knew was hopelessly tainted, and which they knew the WAMU HE-2 Trust could not have legally held, and which its own records showed no loss of principal or interest on. Nelson and

Frankenberger even attempted to force a Sheriff's sale on Mains home, as he was waiting on a transfer decision from the Indiana Supreme Court! See exhibit XX. For all these reasons, equitable tolling not only should apply, but Mains case is the poster child for reasons equitable does apply in such cases.

## SUBPART A

196.     Section 807 of the FDCPA, 15 U.S.C. §1692e, prohibits debt collectors from using any false, deceptive, or misleading representations or means in connection with the collection of any debt.

197.     In numerous instances, through the means described above, in connection with the collection of debts, Defendants, directly or indirectly, have used false, deceptive, or misleading representations or means to collect money from Mains and attempt to encumber or seize his property.

198.     Defendants' representations as set forth in above constitute false, deceptive, or misleading representations or means, in violation of Section 807 of the FDCPA, 15 U.S.C. §1692e.

199.     The acts and practices alleged in above constitute violations of Section 807 of the FDCPA, 15 U.S.C. §1692e.   Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. §1692(a), the acts and practices alleged above also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).

200.     Section 805 of the FDCPA, 15 U.S.C. §1692c, governs communications in connection with a debt generally.   Section 805(b) specifically prohibits communications about a debt with any person other than the consumer, a consumer reporting agency, the creditor, or their attorneys except as allowed by Section 804 or with the permission of the

consumer, or a court of competent jurisdiction, or as reasonably necessary to effectuate post judgment relief.

201.     In numerous instances, through the means described above. In connection with the collection of debts, Defendants, directly or indirectly, have communicated about a debt with persons other than the consumer, a consumer reporting agency, the creditor, or their attorneys without the permission of the consumer, or as otherwise allowed by Section 804.

202.     The acts and practices alleged in Paragraph 45 constitute violations of Section 805(b) of the FDCPA, 15.U.S.C.  Pursuant to Section 814(a) of the FDCPA, 15 U.S.C §1692l(a). the acts and practices alleged in Paragraph 45 also constitute unfair or deceptive acts or practices in violation of Section 5(a). of the FTC Act, 15 U.S.C.  §45(a).

### SUBPART B

Unlawful Failure to Cease Communications

203.     Section 805 of the FDCPA, 15 U.S.C & 1692c, governs communications in connection with debt generally. Section 805(c) specifically prohibits communication with a consumer with respect to a debt if the consumer has notified the debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer except to advise the consumer that the debt collector's further efforts are being terminated, to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor to notify consumer that the debt collector creditor intends to invoke specified remedy.

204.     Mains issued a rescission of his mortgage. Chase Bank violated section 1692(c) by failing to cease its communications with Mains and trying to collect a debt that no longer existed via the notice it sent to Mains in Exhibit XX. Further, Chase violated sections 1692(c) 2 (a) and (b), 4, and 5, by sending a notice that instead of recognizing Mains lawful rescission, falsely represrented the legal status of the debt as still active, that their home could still be foreclosed on, that they could modify a debt that no longer existed, and using veiled threats that their agent law firm Nelson and Frankenberger could still legally proceed with sheriffs sale. The acts and practices alleged in Paragraph XX and above constitute violations of Section 805(c) of the FDCPA, 15 U.S.C. & 1692c(c). Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. & 16921(a), the acts and practices alleged in Paragraph XX and above also constitute unfair or deceptive acts or practices in violation of Section 2 (a) and (b), 4, and 5(a) of the FTC Act, 15 U.S.C. & 45(a).

## RELIEF

205.     15 U.S. Code § 1692k - Civil liability (a) Amount of damages

Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1)any actual damage sustained by such person as a result of such failure;

(2)

(A)in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or

(3)in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court

that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

206.    Plaintiff Mains, pursuant to FDCPA and the Court's own equitable powers, requests that the Court award such relief as the Court finds necessary to redress injury to Mains resulting from Defendants' violations of the FDCPA as noted in this complaint, including but not limited to monetary civil penalties for each violation of the FDCPA, actual damages suffered by Mains, and the costs of bringing this action as well as such other and additional relief as the Court may determine to be just and proper as allowed by the FDCPA.

## COUNT 9
## R.I.C.O, 18 U.S. Code § 1962

207.    PLAINTIFFS refer to and incorporate by reference herein each and every allegation contained above.

208.    Prohibited RICO activities are defined as follows:

209.    18 U.S. Code § 1962 - Prohibited activities:

(a)It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce

(b)It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d)It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**Civil remedies are allowed under the act as follows:**

**18 U.S. Code § 1964 - Civil remedies**

(a)The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders....

(c)Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees…...

**The court has jurisdiction to hear Mains complaint under the RICO statutes:**

**18 U.S. Code § 1965 - Venue and process**

(a)Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

**Defined terms in relation to RICO statutes include in part:**

**18 U.S. Code § 1961 - Definitions**

(3)"person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4)"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(6)"unlawful debt" means a debt

(A) …..which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) ……..or the business of lending money or a thing of

value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

From the following guide, racketeering is defined generally as follows:

Section 1961(1)(A) defines racketeering activity as follows: **any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act) [i.e., 21 U.S.C. § 802], which is chargeable under State law and punishable by imprisonment for more than one year.**

210. This definition does not identify specific state statutes that may provide the basis for a RICO predicate act of racketeering. Rather, Congress intended the state offenses referenced in Section 1961(1)(A) to identify "generically" the kind of conduct proscribed by RICO, and therefore it is immaterial whether a state statute uses the same labels or classifications as specified in Section 1961(1)(A). Thus, a state statutory offense may constitute a proper RICO predicate racketeering act under Section 1961(1)(A) provided it substantially conforms to the "generic" definition of the state offense referenced in Section 1961(1)(A) prevailing in 1970 when RICO was enacted. .....Indeed, as a general rule, even if a defendant were acquitted in state court of a state offense referenced in Section 1961(1)(A), such state offense, nevertheless, may be charged as a proper RICO predicate act.

211. See: CRIMINAL RICO: 18 U.S.C. §§ 1961-1968 A Manual for Federal Prosecutors FIFTH REVISED EDITION OCTOBER 2009, pages 20-22. Prepared by the Staff of the Organized Crime and Racketeering Section, U.S. Department of Justice.

### SUBPART A

212. At all relevant times, each RICO Defendant is a person within the meaning of the RICO statutes and definitions as noted supra. As to the Corporate Defendants, their

named employees in their capacities as employees include the following individuals, Cynthia Riley, Jodi Sobotta, and Christine A. Sauerer.

213.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing enterprise which committed fraudulent acts and attempted to collect on unlawful debt from Mains within the meanings of the RICO statutes. The debt was unlawful as to usury laws when factoring in late fees and interest which Defendants tacked on the debt they attempted to collect from Mains. Collectively, these fees and interest rates amounted to an in-fact interest rate on Mains debt which violated defined state and federal usury laws. A full accounting of Mains claimed debt owed to Defendants, which Mains has asked for in this case, will substantiate these usury violations. Defendants, through a multi-faceted campaign of lies, fraud, and corruption attempted to coerce Plaintiff into paying monies to RICO Defendants and their co-conspirators. The RICO Defendants in Mains case, and their co-conspirators, have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating throughout the United States. They have been responsible for oversight of the scheme to defraud Mains, and other customers, and have directed others to follow suit while not having proper documentation to support claims brought in state court actions in Indiana. Lawrence Frankenberger has been primarily responsible for prosecuting the sham litigation in Mains foreclosure action, under LPS direction and using their software products and employees aid to do so. Chase Bank and Citigroup directed the prosecution to try to collect this unlawful debt in the name of the WAMU HE-2 Trust, while at the same time trying to make claims that they were somehow "remote" from the fraud and forgery they

had in fact retained their agents to commit in the name of collecting on this unlawful debt.

**214.**     The RICO Defendants and their co-conspirators in Mains case constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "Enterprise." Each of the RICO Defendants participated in the operation or management of the Enterprise

215.     At all relevant times, the Enterprise was engaged in activities that affected interstate and foreign commerce within the meaning of 18 U.S.C. §§ 1961(5) and in violation of 18 U.S.C. §§ 1962(c) , to wit:

216.     As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud Mains, various courts of law, and the greater public in relation to residential mortgage "loans" which they knew violated various statutory lending laws such as RESPA, TILA, and Reg Z, and were unenforceable generally under the statutes of fraud (as codified in various state codes and under common law). The attempted foreclosures on the security interests they claimed under these 'loans", i.e, the victims homes, were accomplished by manufactured evidence (i.e. fraudulent affidavits, forged signatures), and then fraudulent phone calls and meetings with victims like Mains, and of course through court actions to perfect the foreclosures.

217.     The ultimate objective of the RICO Defendants' scheme or artifice to defraud is to coerce Mains into making payments that will directly benefit the individuals and organizational RICO Defendants enterprise.

218.     Pattern of Racketeering Activity in Mains case includes multiple instances of mail fraud and wire fraud in Violation of of 18 U.S.C. §§ 1341- 1343, attempts to coerce

unlawful debt through mail and phone in violation of the FDCPA, etc., all of which are described in Mains complaint.

219.     Mains sustained multiple injuries in the form of attorney's fees to ward off the enterprises unlawful actions, clouding of title to his property, and other actual damages as described in his complaint.

220.     Further, the Defendants Enterprise misled the state trial court in Mains case by fraudulently misrepresenting the Defendants interest in the suit; and as mentioned, Mains incurred damages when he was compelled to defend his interests.

221.     If Defendants had no right to file the foreclosure action, it makes no difference whether Mains previously had defaulted on his mortgage and note as they claim. The numerous injuries sustained as a result of the defendants' RICO violations are a separate and distinct matter from the question of whether the state ultimately decided they had a right to foreclose on Mains (again, noting that the state court was unaware of the fraud Mains has recently discovered when they did reach their decision). Mains is not barred by Rooker Feldman or by Res Judicata from seeking a redress for his injuries, and as specifically noted by the Department of Justices Manual on RICO as stated Supra, " Indeed, as a general rule, even if a defendant were acquitted in state court of a state offense referenced in Section 1961(1)(A), such state offense, nevertheless, may be charged as a proper RICO predicate act".

RELIEF

222.     For these reasons as stated Supra, and due to the injuries Mains has sustained and continues to sustain, Mains seeks a declaratory judgment that Defendants have in fact formed and operated a RICO enterprise as defined by statute Supra, and that the

racketeering activity of the Defendants RICO enterprise unlawfully caused injuries to Mains in their attempts to collect unlawful debt from him. Mains seeks relief in the form of damages as allowed under section 1964 for treble the damages he has sustained, including attorney's fees and other such damages as the court deems just and proper.

## PRAYER FOR RELIEF

1. PLAINTIFFS refer to and incorporate by reference herein each an every allegation contained above.

2. Mains alleges that the circumstances are appropriate for an accounting and equitable relief as to Defendants Chase Bank, Citibank, and the WAMU HE-2 Trust or other identified owner or controller of the Mains' note or security.

3. Mains has been trying but cannot secure the knowledge of basic facts about the loan and what he owes. Mains hereby requests all data that went into it the present figures on the loan including the payoff figure, the penalties and interest used to calculate it, the time periods and reasons penalties and interest were added to the balance, the principal balance changes through time, the original amortization figure, the monthly payment amount, any understanding that would affect or did effect or change the monthly figure amount, the way payments were treated when the full amount was not paid and way, including an backup information, like manuals that support the action taken. Request is made for the inked version of all documents and allonges that show proper authority to enforce any note or mortgage.

4. A balance due from the Mains to the lender that can only be ascertained by a full accounting, including payments made by any third-party payor.

5. The amount that Mains owes is unknown and cannot be ascertained without a full

accounting of the above-mentioned loan.

6.  If a full accounting cannot be provided to prove the amount due an to whom it is due, it is requested that the court use its equitable powers to enjoin further collection or other activity against the Mains and their property.

7.  Without providing a proper accounting, any claims made by any of the Defendants on any debt or security must be declared void and must not be allowed to proceed.

8.  The Mains seek the above and all relief allowed by law if a proper accounting is not provided.

9.  **Plaintiff reserves the right to amend or supplement this Complaint as is required or needed.**

10. In Summary, PLAINTIFF pray for judgment as follows for the aforementioned causes of actions, counts, etc. as may be appropriate.  Specifically,

    1. For rescission;

    2. For special damages according to proof at trial;

    3. For compensatory damages according to proof at trial, including pain, suffering, and mental anguish; and the value of their investment had it been invested in a well-managed portfolio.

    4. For equitable remedies including disgorgement and recoupment of unjust enrichment;

    5. For injunctive relief;

    6. For punitive damages;

    7. That damages be doubled or trebled as allowed by law;

    8. For lost principal and the losses therefrom;

9. For costs, disbursements, and attorney's fees;

10. Demand for Jury Trial; and

11. For such other, further, and different relief as the Court deems just

and equitable including interest at the legal rate.

Respectfully Submitted,

/S/ Jon M. Schulte
Jon M. Schulte
Attorney I.D. Number 29479-10
SMITH CARPENTER FONDRISI
& CUMMINS, LLC
209 East Chestnut Street
P.O. Box 98
Jeffersonville, IN 47131-0098
(812) 282-7736

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true copy of the foregoing pleading was served upon all persons and/or attorneys of record by depositing a copy of the same in the U.S. Mail, in an envelope properly addressed and with sufficient postage prepaid, or hand delivered, on the ___ day March, 2015.

/S/ Jon M. Schulte
Jon M. Schulte