Plaintiff's Exhibit A.

"Consent Order"

State of Indiana is listed on page 24.  An asterisk denotes "Indiana."

JEFFREY S. CHIESA
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street - 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiffs

By:  Krima D. Shah, Special Deputy Attorney General
     Patricia Schiripo, Deputy Attorney General / Assistant Chief
     Consumer Fraud Prosecution
     (973) 648-7819

|  |  |
|---|---|
| | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION, MERCER<br>COUNTY<br>DOCKET NO. _____ |
| JEFFREY S. CHIESA, Attorney General of the<br>State of New Jersey, and ERIC T. KANEFSKY,<br>Acting Director of the New Jersey Division of<br>Consumer Affairs,<br><br>                        Plaintiffs,<br><br>       v.<br><br>LENDER PROCESSING SERVICES, INC., a<br>Delaware Corporation, LPS DEFAULT<br>SOLUTIONS, INC., a Delaware Corporation,<br>and DOCX, LLC a Georgia Limited Liability<br>Company,<br><br>                    Defendants. | Civil Action<br><br><br>**FINAL CONSENT JUDGMENT** |

Plaintiffs, Jeffrey S. Chiesa, Attorney General of New Jersey ("Attorney General") and Eric

T. Kanefsky, Acting Director of the New Jersey Division of Consumer Affairs  (collectively

"Plaintiffs"), and Defendants Lender Processing Services, Inc., LPS Default Solutions, Inc., and



PLAINTIFF'S EXHIBIT

A

DocX, LLC (hereinafter collectively referred to as "LPS" or "Defendants"), by and through the undersigned counsel, have requested entry of a Final Consent Judgment. Therefore, upon consideration of the papers filed and consent of the parties hereto, it is hereby ORDERED and ADJUDGED as follows:

## I.    JURISDICTION

The parties agree that this Court has subject matter jurisdiction over this matter and jurisdiction over the parties and agree to the continuing jurisdiction of this Court over this matter and the parties. The Attorney General filed a Complaint (the "Complaint") against LPS pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. ("CFA")

## II.    GENERAL PROVISIONS

### 2.1    Agreement

The Plaintiffs and Defendants are represented by counsel and have agreed on a basis for settlement of the matters alleged in the Complaint. The parties agree to entry of this Final Consent Judgment ("Judgment") without the need for trial, discovery in this action, or adjudication of any issue of law or fact. Defendants enter into this Judgment freely and without coercion, and without admitting any violation of the law. Defendants acknowledge that they are able to abide by the provisions of this Judgment. Defendants further acknowledge that a violation of this Judgment may result in additional relief pursuant to the CFA, N.J.S.A. 56:8-1 et seq.

### 2.2    Definitions

a.    "Attesting Documents" shall mean affidavits and similar sworn statements making various assertions relating to a mortgage loan, such as the ownership of the mortgage note and mortgage or deed of trust, the amount of principal and interest due, and the fees and expenses chargeable to the borrower.

b.      **"Covered Conduct"** shall mean LPS' practices related to mortgage default servicing, including document creation, preparation, execution, recordation, and notarization practices as they relate to Mortgage Loan Documents as well as LPS' relationships with attorneys representing the Servicers and other third parties through the Effective Date of this Judgment.

c.      **"Effective Date"** shall mean the date on which a copy of this Judgment, duly executed by Defendants and by the Signatory Attorney General, is approved by and becomes a Judgment of the Court.

d.      **"Federal Banking Agencies"** shall mean the Board of Governors of the Federal Reserve System, The Federal Deposit Insurance Corporation, The Office of the Comptroller of the Currency, and the Office of Thrift Supervision.

e.      **"Investigating Attorneys General"** shall mean the Attorneys General of the States of Arizona, California, Connecticut, Florida, Illinois, Iowa, Oregon, New Jersey, North Carolina, Pennsylvania, South Carolina, Texas, and Washington.

f.      **"LPS"** shall mean Defendants Lender Processing Services, Inc.; LPS Default Solutions, Inc.; and DocX, LLC, including all of their parents, subsidiaries, and divisions.

g.      **"Mortgage Loan Documents"** shall mean (i) Attesting Documents; (ii) assignments of mortgages or deeds of trust or notes; (iii) mortgage or deed of trust lien releases and satisfactions; (iv) notices of trustee sale; (v) notices of breach or default; and (vi) other mortgage-related documents that are required for statutory, non-judicial foreclosure or foreclosure-related documents filed with a state court or in connection with a federal bankruptcy proceeding.

h.      **"Parties"** shall mean LPS and the Signatory Attorney General.

i.      **"Servicer"** shall mean any residential mortgage loan servicing entity to which LPS provides technology and/or other services relating to mortgages in default.

j.      "**Signatory Attorney General**" shall mean the Attorney General of New Jersey, or his/her authorized designee, who has agreed to this Judgment.

2.3      <u>**Stipulated Facts**</u>

The Investigating Attorneys General conducted investigations regarding certain business practices relating to the Covered Conduct.  The Investigating Attorneys General found and the Defendants stipulate to the following facts of the investigation:

a.      During a period from at least January 1, 2008, to December 31, 2010, certain Servicers authorized specific persons employed by certain subsidiaries of Lender Processing Services, Inc., to sign Mortgage Loan Documents or assist with the execution of Mortgage Loan Documents on their behalf.

b.      Some Mortgage Loan Documents generated and/or executed by certain subsidiaries of Lender Processing Services, Inc., on behalf of Servicers contain defects including, but not limited to, unauthorized signatures, improper notarizations, or attestations of facts not personally known to or verified by the affiant.  Some of these Mortgage Loan Documents may contain unauthorized signatures or may contain inaccurate information relating to the identity, location, or legal authority of the signatory, assignee, or beneficiary or to the effective date of the assignment.

c.      Certain subsidiaries of Lender Processing Services, Inc., recorded or caused to be recorded Mortgage Loan Documents with these defects in local land records offices or executed or facilitated execution on behalf of the Servicers knowing some of these Mortgage Loan Documents would be filed in state courts or used to comply with statutory, non-judicial foreclosure processes.

d.      At some time prior to November 1, 2009, employees and agents of DocX, LLC ("DocX") a wholly owned, indirect subsidiary of Lender Processing Services, Inc., were directed by management of DocX to initiate and implement a program under which some DocX employees

signed Mortgage Loan Documents in the name of other DocX employees, who were or had been at one time authorized to sign on behalf of Servicers. DocX referred to these unauthorized signers as "Surrogate Signers."

e.   At the time the Surrogate Signers signed certain Mortgage Loan Documents, they were not authorized by the applicable Servicer to sign their own names or the names of those persons who had purportedly been authorized by the Servicer to sign the Mortgage Loan Documents in question.

f.   The Surrogate Signers executed certain Mortgage Loan Documents in the name of other DocX employees without indicating that the documents had been signed by a Surrogate Signer.

g.   Notaries public employed by DocX or as agents of DocX completed the notarial statements on the Mortgage Loan Documents that were executed by Surrogate Signers and stated that those documents had been properly acknowledged, signed, and affirmed in their presence by the person whose name appeared on the document when in fact the Surrogate Signer had signed the name of another person or signed outside the presence of the notary, or both.

h.   DocX presented and recorded certain Mortgage Loan Documents with local land records offices knowing they had been executed by Surrogate Signers.

i.   On or around November 2009, Lender Processing Services, Inc., conducted an internal review of DocX and identified certain Mortgage Loan Documents that contained inaccuracies, unauthorized signatures, notarization defects, or other deficiencies. Lender Processing Services, Inc., has also identified certain other defects and deficiencies in the Mortgage Loan Documents executed by some of its other subsidiaries. Such past practices, when discovered by Lender Processing Services, Inc., management, were discontinued.

j.      On April 13, 2011, LPS entered into a Consent Order with Federal Banking Agencies, which order contains similar allegations of deficiencies in Mortgage Loan Document execution practices at certain subsidiaries of LPS and management oversight of these practices. Pursuant to the Consent Order, LPS has agreed to take further remedial action, including, but not limited to, proposing a plan to enhance internal auditing and risk management, adopting a comprehensive compliance program for activities relating to default management services, and retaining an independent consultant to conduct an independent review of LPS' document execution services occurring between January 1, 2008, and December 31, 2010, to determine the existence and extent of the deficiencies and to assess LPS' ability to identify affected Mortgage Loan Documents, to remediate the deficiencies, as appropriate, and to assess whether any financial injury to Servicers or borrowers resulted from the document execution services described herein. To the extent the independent consultant identifies any such financial harm, LPS has agreed to prepare a remediation plan under the Consent Order that will, as appropriate, address reimbursement to those borrowers for any such financial injury.

### 2.4    **Preservation of Law Enforcement Action**

Nothing herein precludes the Signatory Attorney General from enforcing the provisions of this Judgment, or from pursuing any law enforcement action with respect to the acts or practices of the Defendants not covered by this Judgment or any acts or practices of the Defendants conducted after the entry of this Judgment. The fact that such conduct is not expressly prohibited by the terms of this Judgment shall not be a defense to any such enforcement action.

### 2.5    **Compliance with State and Federal Law**

Nothing herein relieves Defendants of their duty to comply with applicable laws of the State and all federal or local laws, regulations, ordinances, and codes, nor constitutes authorization by the

Signatory Attorney General for the Defendants to engage in acts or practices prohibited by such laws. If, subsequent to the Effective Date of this Judgment, any state, local, or federal law is enacted or regulation promulgated with respect to the Covered Conduct of this Judgment and Defendants intend to comply with the newly enacted legislation or regulation and that compliance may create a conflict with the terms of this Judgment, Defendants shall notify the Signatory Attorney General of this intent. If the Attorney General agrees, the Attorney General shall consent to a modification for the purpose of eliminating the conflict. The Attorney General agrees that consent to modify is appropriate if any conduct prohibited by this Judgment is required by State, local, or federal law or regulation, or if conduct required by this Judgment is prohibited by such State, local, or federal law or regulation. The Attorney General will give each request to modify based on a change in the applicable law reasonable consideration and will respond to the Defendant(s) within 90 days. Nothing herein is intended to preclude Defendants from seeking modification of this Judgment if the Attorney General does not consent to the request of the Defendant(s).

### 2.6 Non-Approval of Conduct

Nothing herein constitutes approval by the Signatory Attorney General of LPS' past or future practices. LPS shall not make any representation to the contrary.

### 2.7 Release

The Signatory Attorney General hereby releases and discharges LPS and each and all current and former officers, shareholders, and employees from civil or administrative claims that his or her State has or may have had against them under the CFA, N.J.S.A. 56:8-1 et seq., including claims for damages, fines, injunctive relief, remedies, sanctions, or penalties resulting from the Covered Conduct on or before the Effective Date (collectively, the "Released Claims").

Nothing herein shall be construed as a waiver or release of any private rights, causes of action, or remedies of any person against the Defendants with respect to the Covered Conduct.

### 2.8    Evidentiary Effect of this Judgment

This Judgment is not and shall not in any event be construed, deemed to be, and/or used as an admission or evidence of the validity of any claim that the Signatory Attorney General has or could assert against LPS, or an admission of any alleged wrongdoing or liability by LPS in any civil, criminal, or administrative court, administrative agency, or other tribunal anywhere in the country. The agreement of LPS to comply with the provisions of this Judgment is not an admission that LPS ever engaged in any activity contrary to any law.  Moreover, by entering into this Judgment and agreeing to the terms and conditions provided herein, LPS does not intend to waive and does not waive any defenses, counterclaims, third party claims, privileges or immunities it may have in any other action or proceeding that has been or may be brought against it by any other State, Federal or local governmental agency, or any private litigant or class of litigants, arising from the practices described herein.

### 2.9    Titles or headings

The titles or headings to each section or provision of this Judgment are for convenience purposes only and are not intended by the parties to lend meaning to the actual provisions of this Judgment.

### 2.10   Modification of Terms

No waiver, modification, or amendment of the terms of this Judgment shall be valid or binding unless made in writing, agreed to by both parties, and approved by this Court and then only to the extent specifically set forth in such written waiver, modification, or amendment.

### 2.11   Severability of Terms

If any clause, provision, or section of this Judgment shall, for any reason, be held illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability shall not affect any other clause, provision, or section of this Judgment, and this Judgment shall be construed and enforced as if such illegal, invalid, or unenforceable clause, section, or other provision had not been contained herein.

### 2.12   Time is of the Essence

Time is of the essence with respect to each provision of this Judgment that requires action to be taken by LPS within a stated time period or upon a specified date or event.

### 2.13   Execution in Counterparts

This Judgment may be executed in any number of counterparts and by different signatories on separate counterparts, each of which shall constitute an original counterpart hereof and all of which together shall constitute one and the same document.  One or more counterparts of this Judgment may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart thereof.

### 2.14   No Acts to Circumvent Terms

LPS shall not participate directly or indirectly in any activity or form a separate entity or corporation for the purpose of engaging in acts or practices in whole or in part that are prohibited by this Judgment or for any other purpose that would otherwise circumvent any part of this Judgment.

### 2.15   More Favorable Terms.

In the event that LPS voluntarily enters into an agreement with the Attorney General of any state that is not participating in this Judgment ("non-participating Attorney General") to resolve

potential claims relating to the Covered Conduct in this Judgment on terms that are different than those contained in this Judgment, exclusive of LPS' payment to a non-participating Attorney General of reasonable costs and attorneys' fees incurred by the non-participating Attorney General in civil litigation or criminal investigation that is active and pending as of November 29, 2012, then LPS shall provide a copy of such agreement to each Signatory Attorney General for review. If, after review, the Signatory Attorney General determines those alternative terms are materially more favorable than those contained in this Judgment, then LPS will join the Signatory Attorney General in petitioning the Court to amend this Judgment to reflect any such terms in place of terms herein, without waiving its rights to a judicial determination as to materiality.

### III.   **PERMANENT INJUNCTIVE RELIEF AND COMPLIANCE**

3.1     LPS, and any person acting under the actual direction or control of LPS, are hereby permanently restrained and enjoined from engaging in acts and practices prohibited by federal, state, or local law. Further, LPS, and any person acting under the actual direction or control of LPS, are hereby permanently restrained and enjoined from engaging in the following acts and practices and shall comply with the following conduct requirements:

**Document Execution**

a.     LPS shall not engage in, or authorize its employees to engage in, Surrogate Signing, as described in Section 2.3 herein.

b.     LPS shall not execute any Attesting Document unless the affiant or signatory has personal knowledge of the accuracy and completeness of the assertions in the Attesting Document.

c.     LPS shall ensure that any Mortgage Loan Document that is executed by LPS on behalf of a Servicer is executed pursuant to proper and verifiable authority to sign on behalf of the

Servicer and that assertions contained in the Mortgage Loan Document are supported by competent and reliable evidence.

       d.     Any Mortgage Loan Document executed by LPS on behalf of a Servicer shall accurately identify the name of the signatory, the date on which the document is signed, and the authority upon which the signatory is executing the Mortgage Loan Document.  If applicable or permissible, each Mortgage Loan Document shall include the name and address of the entity for which the signatory works.

       e.     LPS shall ensure that the affiant or signatory to any Attesting or Mortgage Loan Document shall sign by hand signature, except for permitted electronic filings.

       f.     LPS shall not notarize or cause to be notarized any Attesting or Mortgage Loan Document that is signed or attested to outside the presence of the notary.

       g.     If LPS provides any notary services or oversees the notarization of any Mortgage Loan Document, LPS shall ensure that the notary procedures comply with all applicable laws governing notarizations, including, but not limited to, ensuring that notaries verify the identity and signature of the putative signatory.  If LPS provides notary services or oversees the notarization of any Mortgage Loan Document, LPS shall ensure that notaries maintain notary logs that identify such Mortgage Loan Documents.

### Law Firms

       h.     LPS shall not improperly interfere with the attorney-client relationship between attorneys and Servicers.

       i.     LPS shall not incentivize or promote attorney speed or volume to the detriment of accuracy.

j.      If LPS provides technology or other services that assist law firms or their agents in handling issues relating to processing a foreclosure, bankruptcy, or other legal action, LPS will ensure that its technology and services do not impede, compromise, or otherwise interfere with the activities of a law firm providing legal services to its client.

k.      LPS will ensure that foreclosure and bankruptcy counsel and foreclosure trustees to whom LPS provides services have an appropriate Servicer contact so they may communicate directly with the Servicer.

l.      LPS shall not inhibit or otherwise discourage attorneys and Servicers from direct communication with each other.

m.      LPS shall not negotiate any retainer agreements between the Servicer and its attorney(s) and LPS shall not be a party to such retainer agreements.

n.      For those attorneys who are using LPS' technology services to access information from Servicers, LPS shall take no action to prevent legal counsel from having appropriate access to information from the Servicer's books and records to perform their duties in compliance with applicable laws.

**Incentives**

o.      LPS shall not pay volume-based or other incentives to employees or other agents for the purpose of encouraging undue haste or lack of due diligence to the detriment of accuracy.

**Third-Party Provider Oversight**

p.      LPS shall adopt policies and processes to oversee and manage agents, independent contractors, entities and third parties (including subsidiaries and affiliates) retained by LPS that provide foreclosure, bankruptcy or mortgage-servicing activities relating to default servicing

(including loss mitigation) (collectively, such activities are "Servicing Activities" and such providers are "Third-Party Providers"), including the following:

      (i).    LPS shall perform appropriate due diligence of Third-Party Providers' qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability.

      (ii).    LPS shall ensure that all agreements, engagement letters, or oversight policies with Third-Party Providers comply with LPS' applicable policies and procedures (which will incorporate any applicable aspects of this Judgment) and applicable state and federal laws and rules.

      (iii).    LPS shall ensure that agreements, contracts or policies provide for adequate oversight, including measures to enforce Third-Party Provider contractual obligations, and to ensure timely action with respect to Third-Party Provider performance failures.

    q.    LPS shall conduct periodic reviews of Third-Party Providers. These reviews shall include the following:

      (i).    A review of the fees and costs assessed by the Third-Party Provider to ensure that such fees and costs are within the allowable fees authorized by the Servicers;

      (ii).    A review of the Third-Party Provider's processes to provide for compliance with LPS' policies and procedures concerning Servicing Activities;

      (iii).    A requirement in its agreements and contracts to require that the Third-Party Provider disclose to LPS any imposition of sanctions or professional disciplinary action taken against them for misconduct related to performance of Servicing Activities.

**Fees**

r.    LPS shall require that all fees charged by Third-Party Providers for default, foreclosure, and bankruptcy-related services performed shall be within the allowable fees authorized by Servicers.

s.    LPS shall be prohibited from collecting any unearned fee, or giving or accepting unlawful referral fees in relation to Third-Party Providers' default- or foreclosure-related services.

t.    Other than reasonable fees charged by LPS to the Servicers for its oversight of Third-Party Providers, LPS shall not impose additional mark-ups or other fees on Third-Party Providers' default- or foreclosure-related services.

u.    LPS' invoices to the Servicers shall label each fee or charge clearly and accurately to denote the specific product or service for which each fee or charge is attributed.

**Escalation of Consumer Complaints**

v.    LPS shall provide to consumers, and ensure that its Third-Party Providers provide to consumers, reasonable notice of dedicated toll-free telephone numbers established and maintained by LPS that consumers can call concerning any issues related to document execution and field services activities (property inspection, preservation, maintenance, and winterization) LPS performs for Servicers.  LPS shall have adequate and competent staff to answer and respond to consumer inquiries promptly, and LPS shall establish a process for dispute escalation and direct contact with a Servicer at a number designated by such Servicer, and methods for tracking the resolution or escalation of complaints.

3.2    **Compliance with Attorneys General Agreements with Servicers and other Applicable Laws**

a.      LPS shall be familiar with the settlement terms between the State Attorneys General and any Servicers, including those agreements and judgments already in force, such as the consent judgments entered by United States District Judge Rosemary Collyer of the United States District Court for the District of Columbia in case number 1:12-cv-00361-RMC, *United States et al. v. Bank of America et al*, ("hereinafter referred to as the "National Servicing Settlement") and, upon notification by an Attorney General, any agreements reached or judgments entered subsequent to the entry of this Judgment that affect LPS' acts or practices relating to the Covered Conduct of this Judgment.

b.      LPS shall ensure that any services provided by LPS are consistent with the terms, conditions, and standards imposed by those agreements and judgments as well as with any applicable state or federal law.

c.      LPS will commit appropriate resources to develop technology solutions which will support the National Servicing Settlement standards and guidelines.   LPS will make these technology solutions available to its clients, including, without limitation, the following:

- Protections for Military Personnel under the Service members Civil Relief Act (SCRA);

- Document Integrity Solution that enables Servicers to ensure the accuracy and personal knowledge requirement for the execution of certain Mortgage Related Documents;

- Development of a technology process to avoid dual-tracking by enabling a Servicer to define certain steps or critical events to halt a foreclosure process during a loan modification program;

- Processes to enable Servicers to provide a single point of contact; and

- Enhanced loss mitigation processes.

For a two-year period from the Effective Date of this Judgment, LPS will provide a process for the Signatory Attorney General to audit LPS with respect to the development, functionality and implementation timelines for such technology solutions relating to the National Servicing Settlement. This audit process is in addition to and does not limit LPS' obligations under Section 3.2(e) herein.

d.      LPS agrees to retain documents and other information reasonably sufficient to establish compliance with the provisions of this Judgment; however, nothing in this Judgment requires LPS to retain any specific document or other information for longer than five (5) years.

e.      For a period of five (5) years from the Effective Date, upon a request from the Signatory Attorney General, LPS agrees to provide to the Signatory Attorney General's Office reasonable access to all non-privileged LPS documents and other information without the need for a subpoena or other compulsory process. The term "non-privileged" means any LPS document or other information not protected by the attorney-client or attorney work product privileges as defined by applicable state law. The term "reasonable access" reflects an understanding by LPS and the Signatory Attorney General's Office that LPS has a legal obligation to protect the privacy of personal identifying information of borrowers and to protect the trade secrets of LPS from public disclosure. LPS and the Signatory Attorneys General agree to work cooperatively to ensure compliance with these legal obligations. In the event that LPS concludes that specific information

requested is not covered by this provision and cannot be disclosed without a subpoena or other compulsory process, it will notify the Signatory Attorney General within ten (10) days that a subpoena for the information will be required.

This provision is intended to supplement and does not supplant or in any way restrict the Signatory Attorney General's subpoena power and investigative authority under state law.

Subject to the provisions above regarding non-privileged documents and other information, and legal obligations to protect the privacy of personal identifying information and trade secrets from public disclosure, LPS agrees to cooperate with any Signatory Attorney General in its investigation of non-parties related to Covered Conduct.

f.      LPS shall ensure that if it is appointed to act as a trustee or successor trustee, LPS will meet all applicable state requirements to act as a trustee or successor trustee.

g.      LPS shall appoint its Chief Compliance Officer Sheryl L. Newman, or another designee, to act as liaison to the Signatory Attorneys General to receive and respond to inquiries relating to this Judgment.

## IV.      <u>REMEDIATION TO HOMEOWNERS</u>

4.1      LPS agrees to identify Mortgage Loan Documents executed by LPS between January 1, 2008, and December 31, 2010, that may require remediation and to remediate those documents when LPS has the legal authority to do so and when reasonably necessary to assist any person or borrower or when required by state or local laws.  If Mortgage Loan Documents executed by LPS prior to January 1, 2008, require remediation for compliance with applicable laws or when remediation of Mortgage Loan Documents executed by LPS prior to January 1, 2008, is reasonably necessary to assist any person or borrower, LPS shall remediate those documents when LPS has the legal authority to do so.  Notwithstanding LPS' obligations pursuant to this paragraph, its obligations

under Section 3.1(v) of this Judgment to address consumer inquiries with respect to document execution are not limited to documents executed between January 1, 2008 and December 31, 2010. For twelve quarters immediately following entry of this judgment, LPS shall provide each Signatory Attorney General with quarterly reports detailing its efforts to fulfill its obligations under this paragraph.

## V.   **MONETARY RELIEF**

5.1    LPS shall pay a total of $2,904,356 as settlement payment to the Signatory Attorney General, within 10 (ten) days of the entry of this Judgment, and in accordance with the amounts of payments to each Signatory Attorney General set forth in the attached Exhibit A. This payment shall be used by the Signatory Attorney General for attorney's fees and other costs of investigation and litigation, placed in or applied to the consumer protection enforcement fund, used to defray costs of the inquiry leading to this Judgment, or used for any other purposes permitted by state law, at the sole discretion of the Signatory Attorney General.   If any independent review or report by the Federal Banking Agencies determines that a greater number of documents might be affected than what was previously disclosed by Defendants, Defendants agree to notify the Signatory Attorney General within thirty (30) days and increase the payment to the State in accordance with the methodology used to calculate the State payment described in Exhibit A.

5.2    LPS shall pay to the Investigating Attorneys General a total of $7 million in additional attorney's fees and costs to be divided and paid by LPS to each Investigating Attorney General as designated by, and in the sole discretion of, the Investigating Attorneys General.[1]

5.3    Satisfaction of the monetary obligations in this Section V shall not relieve any other obligations under other provisions of this Judgment.

---

[1] Payment to the Investigating Attorney General of the State of New Jersey is $200,000.

## VI.   RIGHT TO REOPEN

6.1    If, upon motion of the Signatory Attorney General and after hearing by the Court, the Court finds that LPS failed to pay any amount pursuant to the terms provided by Section V or, subject to the provisions of Section VII of this Judgment, that LPS failed to comply with the provisions in Section II, III, or IV, the Court may enter judgment against LPS in favor of the Signatory Attorney General, in an amount to be determined by the Court, subject to statutory maximum penalties, which shall become immediately due and payable as civil penalties or, upon motion of the Attorney General, as any element of relief available pursuant to N.J.S.A. 56:8-11, -13 and -19,  less any amount previously paid. Should this Judgment be modified as to the monetary liability of Defendant, in all other respects, this Judgment shall remain in full force and effect, unless otherwise ordered by the Court.

6.2    Proceedings to reopen this case instituted under this Section are in addition to, and not in lieu of, any other civil or criminal remedies as may be available by law, including any other proceedings that the Signatory Attorney General may initiate to enforce this Judgment.

## VII.   COMPLIANCE ENFORCEMENT

7.1    The Signatory Attorney General may assert any claim that LPS has violated this Judgment in a separate civil action to enforce compliance with this Judgment or may seek any other relief afforded by law, provided that the Signatory Attorney General gives LPS written notice of the alleged violation and affords LPS thirty (30) days from receipt of the notice to respond to and remedy the violation, or any other period as agreed to by the Signatory Attorney General and LPS. However, the Attorney General is not required to provide notice in advance of taking any enforcement action within his or her authority that the Attorney General believes is necessary to protect the health or safety of the public.

## VIII.   NOTICES

8.1     All notices under this Judgment shall be sent by overnight U.S. mail to the addresses

below:

For the Plaintiff:

Patricia Schiripo, Deputy Attorney General/ Assistant Chief
Department of Law and Public Safety, Division of Law
124 Halsey Street – 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
(973) 648-7819

For the Defendants:

Todd C. Johnson, Executive Vice President and General Counsel
Lender Processing Services, Inc.
601 Riverside Avenue
Jacksonville, FL 32204

## IX.     RETENTION OF JURISDICTION

This Court shall retain jurisdiction over this matter for all purposes.

**IT IS SO ORDERED, ADJUDGED AN DECREED**

This _____ day of _____, 2013.

_____
Judge

JOINTLY APPROVED AND SUBMITTED FOR ENTRY:

FOR PLAINTIFFS
JEFFREY S. CHIESA
ATTORNEY GENERAL OF NEW JERSEY

By: _Krima D. Shah_____      Date: _1 | 30 | 2013_____
     Krima D. Shah
     Special Deputy Attorney General
     Consumer Fraud Prosecution Section
     124 Halsey Street – 5th Floor
     P.O. Box 45029
     Newark, New Jersey 07101
     (973) 648 – 7819

By: _Patricia Schiripo_____     Date: _1/30/13_____
     Patricia Schiripo
     Deputy Attorney General / Assistant Chief
     Consumer Fraud Prosecution Section
     124 Halsey Street – 5th Floor
     P.O. Box 45029
     Newark, New Jersey 07101
     (973) 648 – 7819

FOR DEFENDANT
LENDER PROCESSING SERVICES, INC.


By:_____          Date:_____
        Todd C. Johnson
        Executive Vice President and General Counsel


FOR DEFENDANT
LPS DEFAULT SOLUTIONS, INC.


By:_____          Date:_____
        Todd C. Johnson
        Executive Vice President and General Counsel


FOR DEFENDANT
DOCX, LLC


By:_____          Date:_____
        Todd C. Johnson
        Executive Vice President and General Counsel

COUNSEL FOR DEFENDANTS

_____
Gregory J. Bevelock, Esq.
DECOTIIS, FITZPATRICK & COLE, LLP
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, NJ 07666
Tel:  (201) 928-1100


With copies to:

Melanie Ann Hines
BERGER SINGERMAN LLP
125 South Gadsden Street
Suite 300
Tallahassee, FL 32301
Telephone: (850) 561-3010
Facsimile: (850) 561-3013

Counsel to Lender Processing Services, Inc.,
LPS Default Solutions, Inc., and DocX, LLC


Bernard Nash
Christopher J. Allen
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, DC  20006-5403
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201

Counsel to Lender Processing Services, Inc.,
LPS Default Solutions, Inc., and DocX, LLC

**Exhibit A:**

| STATE | PAYMENT |
|---|---|
| Alabama | $1,039,780 |
| Alaska | $79,786 |
| Arizona | $3,288,621 |
| Arkansas | $692,496 |
| California | $35,592,284 |
| Connecticut | $1,404,186 |
| District of Columbia | $232,505 |
| Florida | $7,659,176 |
| Georgia | $4,137,490 |
| Hawaii | $401,030 |
| Idaho | $890,995 |
| Illinois | $3,364,326 |
| Indiana | $1,652,280 |
| Iowa | $603,400 |
| Kansas | $581,665 |
| Kentucky | $948,906 |
| Louisiana | $395,801 |
| Maine | $515,725 |
| Maryland | $2,993,130 |
| Massachusetts | $1,539,580 |
| Minnesota | $3,073,140 |
| Mississippi | $507,115 |
| Montana | $410,865 |
| Nebraska | $820,190 |
| New Hampshire | $457,961 |
| New Jersey | $2,904,356 |
| New Mexico | $671,531 |
| New York | $1,883,826 |
| North Carolina | $3,743,306 |
| North Dakota | $219,961 |
| Ohio | $2,544,990 |
| Oklahoma | $930,020 |
| Oregon | $2,513,875 |
| Pennsylvania | $2,890,741 |
| Rhode Island | $447,965 |
| South Carolina | $1,830,640 |
| South Dakota | $344,750 |
| Tennessee | $2,335,746 |
| Texas | $5,755,050 |
| Utah | $1,390,326 |
| Vermont | $371,000 |
| Virginia | $3,558,821 |
| Washington | $4,062,940 |
| West Virginia | $203,595 |
| Wisconsin | $1,505,315 |
| Wyoming | $232,491 |
| **TOTAL** | **$113,623,678** |

24