UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION


ERIC P. MAINS
      **PLAINTIFF**

VS.                       CIVIL ACTION NO. 4:15-cv-00036-SEB-WGH

**JURY TRIAL DEMANDED**
*Electronically filed*

CITIBANK, N.A. as TRUSTEE for the WAMU-HE2 Trust
CHASE BANK, N.A.
NELSON & FRANKENBERGER, P.C.
BOSE MCKINNEY & EVANS, LLP
WYATT, TARRANT & COMBS LLP
BLACK KNIGHT Financial Services, LLC (formerly LPS)
CYNTHIA RILEY
CHRISTINE A. SAUERER
JODI SOBOTTA; and
UNKNOWN JOHN DOE'S
      **DEFENDANTS**

**PLAINTIFF'S RESPONSE OBJECTING TO DEFENDANT NELSON
&FRANKENBERG P.C.'s MOTIONS TO DISMISS.**


**1.**     **INTRO:**


Plaintiff, Eric Mains ("Mains" or "Plaintiff"), and by counsel, submits the following in

support of his response objecting to the Motion to Dismiss ("MTD") submitted by Nelson and

Frankenberger P.C. ("N&F"). N&F has elected to join its MTD with that of Black Knight

Financial Services, LLC, formerly LPS ("Black Knight"), as well as that of Bose McKinney and

Evans LLP ("Bose") in their entirety giving those arguments equal weight with those as

submitted by Defendant N&F. This being the case, Mains incorporates his Brief in Response to

Defendant Black Knight's MTD in its entirety and, without limitation, as more specifically

described below, because Plaintiff's responses and arguments made in his Black Knight MTD

Response apply equally to Defendant N&F's responses as contained in its brief. Response points specific to Bose McKinney & Evans, LLP's ("Bose") MTD will be addressed in that MTD, and may not all be applicable as to N&F's MTD since Bose was appellate counsel at the state court level.

N&F begins its MTD with the same misconstrued and inaccurate statement(s) as to Plaintiff's Complaint as was alleged by Black Knight. N&F states,

> *The entire story appears to boil down to a few assertions (1) Plaintiff stopped paying a mortgage loan on a single piece of property; (2) his mortgage and note were improperly assigned from one lender to another; and (3) various other parties acted as if the mortgage and note had been properly assigned. None of these assertions state a viable claim for relief against N&F.*

[Dkt. 42, p. 2].

Plaintiff notes, as he did in his brief in response to Defendant Black Knight's MTD, that improper assignment is only a fragment of the issue as to Black Knight's conduct as well as N&F's. N&F was retained by LPS/Black Knight to promote improper and fraudulent foreclosure actions in various courts, including the state court action against Plaintiff. The actions were improper, as noted in the multi state consent Judgment which LPS/Black Knight paid $127 million to settle (See "Exhibit A"), because signatures used in the assignments LPS/Black Knight produced were forged (signed in assembly line fashion by multiple persons using illegible signatures, but all attributed to one person) and "robo-signed" (underlying chain of title documents to foreclosures not properly verified, using aforementioned forged signatures) contained robonotary signatures (not properly witnessed and notary stamped in assembly line fashion, using forged signatures as aforementioned). This happened in Plaintiff's case, and documents appear to have been backdated as well. **N&F never disclosed its relationship with LPS/Black Knight to the court system or Plaintiff despite numerous discovery requests**

**demanding such information, and to this day refuses to admit to its relationship with LPS/Black Knight.** This is small wonder, as N&F was well aware during the two and one half year (2.5) period from 2010 through mid-2012 when it was forced to withdraw its foreclosure action against Plaintiff that the Office of Comptroller of Currency ("OCC") had issued an order to all the major banks to review and comply with proper foreclosure procedure. These major banks, including Citibank and Chase Bank in Plaintiff's case, were part of the "RICO" chain which it helped to file these "sham" foreclosures for, and it also well knew that LPS/Black Knight, who had retained N&F, was under investigation as well, which resulted in the 2013 multi state AG settlement in "Exhibit A."  N&F did not want to disclose the degree of control LPS Black Knight had over N&F, that it participated in and used LPS/Black Knight's software system which produced the fraudulent and forged documents, that it well knew these documents were improper and proper chain of title was lacking in the foreclosure cases it filed, and that documents were backdated in some cases in order to overcome other standing issues.

The problem was not that "various other parties acted as if the mortgage and note had been properly assigned," even though this is true, it is also that N&F knew the relationship it had with LPS/Black Knight was improper, that the documents it promoted to the court were fraudulent, and N&F concealed this fact in violation of Indiana trial rule 26 and 33. It knew that because of its misconduct and concealment of this relationship that the court and Plaintiff would rely on the validity of the discovery responses and documents which it filed with the court, that the court and Plaintiff would be misled and Plaintiff damaged by being forced to defend against the improper foreclosure it promoted on behalf of, and in conjunction with LPS/Blacknight (whom was retained by Citbank and Chase bank).  **It then has the audacity to claim, much as LPS/Black Knight did, that none of its acts of fraud upon Plaintiff/the Court, negligence**

3

**and negligent misrepresentation, concealment of its relationship with LPS/Black Knight, knowledge of wrongful acts in violation of rule 26 and 33, and attempts to wrongfully collect on a claimed debt in violation of the FDCPA are actionable by Plaintiff as to N&F or state a viable claim for relief**. Plaintiff begs to differ.

   Plaintiff will also note that he clearly reserved his count (5) for Negligent Misrepresentation in his Complaint as to Defendant N&F as well, as he stated in that count that his claim applied to "Citibank, Chase, The WAMU HE-2 Trust,…OR ITS AGENTS" paragraphs 147, 149-151, 153 of count (5). Plaintiff clearly indicated this count applied equally to anyone acting in agency with Citibank, Chase, and the WAMU HE-2 Trust, which includes LPS/Black Knight and the law firms it retained and acted in agency with to conceal, produce, and submit the defective foreclosure documents and proceed to bring a wrongful foreclosure action which Plaintiff was forced to defend himself against. The preceding actions are indeed amplified as to N&F and any law firms retained by LPS/Black Knight, or aware LPS/Black Knight was an actor in the foreclosure action against Plaintiff. This is due to the fact that LPS/Black Knight was under a consent judgment (See "Exhibit A") which required it to cease and desist from further committing forgery and robosigning as to documents it produced for use in foreclosure actions, was to have specifically reviewed and corrected all documents it wrongfully helped to produce, and which were used in the timeframe of Plaintiffs foreclosure action (2008-2010). **N&F, and all other "foreclosure mills" active in the industry, were well aware of this.  Indeed, N&F also knew it was in violation of rule 26 and 33 for not disclosing its relationship with N&F when asked in discovery, disclosing the falseness of the documents that it submitted to the court, and it was under a continuing duty to disclose such to the court as were subsequent law firms involved in Plaintiff's state court action**. The problem was, as has been documented

prevalently by the news media as to such other foreclosure mills like N&F (such as the David

Stern Law Firm in Florida)[1], ethics and concern about misconduct and malpractice are given

short thrift when high paying clients are involved. In 2008 Federal District Court Judge

Christopher Boyko was so fed up with the attorney and servicer antics that he was subjected to in

foreclosure actions at the time, that he wrote a scathing response in which he dismissed a number

of such foreclosure actions. This now famous response, which is attached as exhibit B, is as well

worth reading today as it was back then. He noted in part,

> *In each of the above-captioned Complaints, the named Plaintiff alleges it is the holder and owner of the Note and Mortgage. However, the attached Note and Mortgage identify the mortgagee and promisee as the original lending institution — one other than the named Plaintiff.....* **Understandably, the Court requested clarification by requiring each Plaintiff to submit a copy of the Assignment of the Note and Mortgage, executed as of the date of the Foreclosure Complaint. In the above-captioned cases, none of the Assignments show the named Plaintiff to be the owner of the rights, title and interest under the Mortgage at issue as of the date of the Foreclosure Complaint.** *The Assignments, in every instance, express a present intent to convey all rights, title and interest in the Mortgage and the accompanying Note to the Plaintiff named in the caption of the Foreclosure Complaint upon receipt of sufficient consideration on the date the Assignment was signed and notarized.* **Further, the Assignment documents are all prepared by counsel for the named Plaintiffs.** *These proffered documents belie Plaintiffs' assertion they own the Note and Mortgage by means of a purchase which pre-dated the Complaint by days, months or years.....* *Yet,* **this Court possesses the independent obligations to preserve the judicial integrity of the federal court and to jealously guard federal jurisdiction.** *Neither the fluidity of the secondary mortgage market, nor monetary or economic considerations of the parties, nor the convenience of the litigants supersede those obligations....* **The "real party in interest" rule, to which the Plaintiff-Lenders continually refer in their responses or motions, is clearly comprehended by the Court and is not intended to assist banks in avoiding traditional federal diversity requirements.** *2 Unlike Ohio State law and procedure, as Plaintiffs perceive it, the federal judicial system need not, and will not, be "forgiving in this regard."3*

---

[1]  http://www.tampabay.com/news/courts/civil/collapse-of-david-j-stern-law-firm-throws-foreclosure-courts-into-disarray/1156011

Judge Boyko then reminded all those who would bring a foreclosure action to Federal court of the burden they must carry in his footnote 3[2],

The issues that abounded in Plaintiff's state court case in regard to standing, hearsay evidence, lack of proven damages, and equal protections being given weight to homeowners, seemingly fell on "deaf ears" when Plaintiff raised them to the court(s). The fact that neither the Plaintiff nor the court(s) were apprised of the concealed relationships among parties, fraudulent documents and forgery (including Cynthia Riley's undated and forged assignment in blank), and cooperation among LPS and the other RICO Defendants to carry out a wrongful foreclosure in Plaintiff's case certainly did not help. However, be that as it may, **Plaintiff does not seek to re-try his state court action, or overturn the state court's ruling as he has already pointed out.** He also has no need to, as he has issued a valid rescission of his note and mortgage, effective as of mailing per the Supreme Court in *Jesinoski*, which was not responded to timely as required by TILA as well.

Defendants correctly point out that Plaintiff also included them in counts 6-9 of his Complaint.  Specifically, without limitation, as to Plaintiffs prior responses in his Response to

---

[2]  **"Plaintiff's, 'Judge, you just don't understand how things work,' argument reveals a condescending mindset and quasi-monopolistic system where financial institutions have traditionally controlled, and still control, the foreclosure process…There is no doubt every decision made by a financial institution in the foreclosure process is driven by money. And the legal work which flows from winning the financial institution's favor is highly lucrative.** … Unlike the focus of financial institutions, the federal courts must act as gatekeepers, assuring that only those who meet diversity and standing requirements are allowed to pass through. Counsel for the institutions are not without legal argument to support their position, but their arguments fall woefully short of justifying their premature filings, and utterly fail to satisfy their standing and jurisdictional burdens. The institutions seem to adopt the attitude that since they have been doing this for so long, unchallenged, this practice equates with legal compliance. **Finally put to the test, their weak legal arguments compel the Court to stop them at the gate. The Court will illustrate in simple terms its decision: "Fluidity of the market"—"X" dollars, "contractual arrangements between institutions and counsel"—"X" dollars, "purchasing mortgages in bulk and securitizing" — "X" dollars, "rush to file, slow to record after judgment" — "X" dollars, "the jurisdictional integrity of United States District Court"—"Priceless."  (Emphasis in Bold).** In Re Foreclosures, JUDGE CHRISTOPHER A. BOYKO, Case 1:07-cv-02282-CAB, page 5, footnote 3, Attached as "Exhibit B".

Defendant LPS/Black Knight's MTD, Plaintiff incorporates the following from that response, as they address the same issues which Defendant N&F raises, namely:

**II.**      <u>**Standard of Review**</u> Plaintiff adopts and incorporates LPS/Black Knight's description of the applicable standard of review to a motion to dismiss in its "Argument" section. [Dkt. 30, p. 4-5].

**III**.      <u>**Argument**</u>

**A.**      *Rooker Feldman* **is inapplicable to Plaintiffs Complaint.**

Plaintiff already pointed out that he, as in the case of *Slorp v. Lerner*, Sampson & Rothfuss, 2014 U.S. App. LEXIS 18816, and *Iqbal v. Patel*, 2015 U.S. App. LEXIS 3241 (7th Cir. 2015), is bringing his Complaint due to the damages he suffered as a result of Defendant's actions in bringing a foreclosure lawsuit they lacked the right to bring. Had it not been for their deception and use of forged documents, the state court action against Plaintiff could not have proceeded. Their wrongful actions caused Plaintiff damages. **Plaintiff did not bring a state court action against Defendants LPS/Black Knight and N&F because their coordinated concealment of their relationship and LPS's involvement in Plaintiff's case, and the concealment of the prohibited forgery and robosigning as to Main's mortgage assignment, precluded knowledge as to existence of these claims.** Defendants' argument regarding the *Rooker Feldman* doctrine also ignores the fact that Plaintiff is well within his right to bring his underlying federal claims in a federal court, as his state actions were not final and his claims were independent of that action. See also *Hochstetler v. Federal Home Loan Mortgage*, 2013 U.S. Dist. LEXIS 99403 (N.D. Ind. 2013), borrower's claims could not be dismissed pursuant to *Rooker Feldman* "because they assert independent claims for relief." See further, *GASH*

*Associates v. Village of Rosemont, IL.* 995 F.2d 726, 728 (7th Cir. 1993), **"A Plaintiffs federal claim may even contradict the legal conclusion of a state court judgment as long as the claim is independent."**

**B.     Standing to enforce rights under the PSA was never raised by Plaintiff as an issue in his Complaint.**

Defendant's arguments are not meritorious as Plaintiff pointed out he is not bringing a claim based on non-compliance with the WAMU HE-2 trust PSA, nor simple "flaws in assignment" of his note and mortgage. Plaintiff covered these issues in his response to LPS/Black Knights MTD, and the same response applies here equally.

**C.     Plaintiff's Complaint does not violate Rule 8 & 9, Fed. R. Civ. P.**

Plaintiff pointed out in his response to LPS/Black Knight,

> *Without repeating his Complaint brief ad nauseam to cover the items Defendant claims are missing, the Who was clearly stated to be the listed Defendants in Plaintiffs complaint, including LPS/Black Knight. The what, as repeated above, was the use of (and participation in producing when needed), of fraudulent documents to bring a lawsuit against Plaintiff, and to pursue debt it otherwise would have lacked proper foundation to pursue had it followed the law. The where was the use of said documents in Indiana courtroom proceeding(s) against Plaintiff, and of course the production of documents at LPS/Black Knights Minnesota offices. The when of actions taken and use of the bogus documents is from 2009 until present day. The how as to each Defendant was plainly laid out in Plaintiffs Complaint , including actions taken through mail, wire, and through their retained local counsel in Indiana courts, and does not need reproducing here.*

[Dkt. 43, p. 9].

Plaintiff also notes that further specificity as to fraud claims and RICO claims is contained in his Complaint, and is noted in his further responses to LPS/Black Knight's MTD. While Plaintiff will acknowledge that it took him approximately the first 20 pages of his

complaint to recount the history of his now 6 year battle against Defendants in state court, then about 28 pages to discuss the pattern of fraud and forgery he recently uncovered (not uncovered sooner due in large part to Defendants knowing and active concealment of this activity), and lastly about 35 pages to carefully lay out his causes of action against the Defendants, If Defendants feel unduly burdened by having to sift through a recounting of their actions past and present, maybe they should have thought of that before placing Plaintiff in his current position.

**D.     Res Judicata and Collateral Estoppel are not applicable to Plaintiff's Complaint.**

Defendants N&F and LPS/Black Knight's, are both claiming that Res Judicata and collateral estoppel should rule in their favor, and that the <u>fraud</u> and <u>concealment</u> they participated in should form the basis for Res Judicata and collateral estoppel. First, as Plaintiff has repeated ad nauseam as to Defendants similar *Rooker Feldman* arguments, his claims are not barred by claim preclusion. Some of his claims were only recently discovered due to wrongful concealment by the Defendants, and Plaintiff properly preserved others for a federal court venue. Plaintiff is not seeking to set aside his state court judgment or re-litigate claims in regard to foreclosure of his home, nor are his claims in his federal case ones that were heard in state court. Plaintiff's claims are for damages suffered by having to defend himself against Defendants bringing a wrongful action. **A final judgment on the merits has never been had as to Plaintiffs claims he now brings, and Plaintiff notes that the term "on the merits" also presumes that Plaintiff and the court had full disclosures and fraud was not the basis for any judgment.** LPS/Black Knight was not disclosed as a party to Plaintiff's state court action, one whom had produced the robosigned documents in his case (despite being under a consent judgment to correct and halt this activity) and whom N&F did not disclose the nature of its relationship with. **Both**

9

**LPS/Black Knight and N&F come into court with unclean hands, and now seek to reap the benefit of this non-disclosure and fraud by claiming Plaintiff should have "known of and litigated issues" as it related to their concealment and fraud.** In short, they want to create Res Judicata based on their wrongful actions.

Likewise as to issue preclusion Plaintiff would note that not only are the issues different in his state court action as opposed to his federal court action, i.e, the right to foreclose on Plaintiff's homestead vs the wrongful conduct of Defendants in bringing and maintaining a court action using coordinated fraud and concealment, **but also that the full and fair opportunity to litigate issues in a case (and the concept of fairness and equity itself) is negated by a party who resorts to fraud upon the court, concealment, and negligent misrepresentation of facts in a case.**

### E.   Plaintiff's Common Law Claims Should Not Be Dismissed

 This section is wholly redundant as to LPS/Black Knight's arguments as to why Plaintiff's common law claims should be dismissed and fail for the same reasons. Reliance upon the validity of the assignment which Black Knight produced, which it failed to disclose its part in production of (or its retention of law firms to prosecute Plaintiff), is the reliance Plaintiff addresses. Plaintiff was forced to defend against the assignment which was held out as being valid, when in fact it was not and which a court action could not have been maintained against Plaintiff if this were known and disclosed.  LPS/Black Knight claims its assignment could not represent a material fraud. It backs up this implausible defense by claiming that a fraudulently executed assignment "exists for the protection of third parties", that the forged and undated endorsement in blank by "Cynthia Riley" (when she no longer worked for WAMU by her own

10

federal deposition) was effective to transfer Mains' note "by operation of law," and that their

created assignment and fraud was "superfluous" and could not be material.

Defendant on page 19 asserts that negligent misrepresentation was not appropriate

because it did not guide Plaintiff in a business transaction and the economic loss doctrine

precludes a tort claim. Again, Defendant misconstrues the cause of Plaintiff's action against

them and Indiana law as plainly set out by the Supreme Court of Indiana in *U.S. Bank, N.A. v*

*Integrity Land Title Corp.*, 929 NE2d 742 (Ind., 2010)[3].

Plaintiff points out the importance the court puts on the integrity of the land title chain. It

goes without saying the importance of borrowers to be able to rely on those who are tasked with

having accurately reviewed or participated in said chain, and that the consequences of a "clouded

---

[3] *U.S. Bank, N.A. v Integrity Land Title Corp.*, 929 NE2d 742, 745-46 (Ind., 2010).

> However, we cautioned that **the economic loss rule admits of certain exceptions** for purely commercial loss **in several special circumstances**. **Indiana courts should recognize that the rule is a general rule and be open to appropriate exceptions, such as** (for purposes of illustration only) **lawyer malpractice**, breach of a duty of care owed to a plaintiff by a fiduciary, breach of a duty to settle owed by a liability insurer to the insured, **and negligent misstatement."**

> Regarding whether contracts preclude a court action, the Court further points out,

> Moreover**...the existence or non-existence of a contract is not the dispositive factor for determining whether a tort action is allowable where special circumstances and overriding public policies have carved out exceptions for tort liability**...[W]e find the reasoning of Justice Matthews of the Alaska Supreme Court in Bank of California persuasive: 'We agree with the authorities which hold that there may be tort liability for misrepresentations made in preliminary commitments for title insurance. In our view, **such commitments provide an essential service to prospective buyers and lenders. They are told what transactions must take place before they can receive clear title or an effective security**. In reaching this conclusion, the court stressed that 'preliminary title reports are normally relied on by insureds, escrow agents, and lenders with full knowledge, and sometimes with the encouragement, of the insurance company.' **Title searches are frequently required in situations involving transactions in which the state of the title must be known accurately or the customer will foreseeably suffer harm that is both certain and direct**. Id. at 748-49. (Citations omitted) (Emphasis added).

title" chain extend far beyond pure economic loss to effecting a borrowers quiet enjoyment of his home, his emotional well-being, and indeed the very stable existence of family. Plaintiff and his counsel requested accurate information of any holders claimed interest in his property, and how this information was derived in discovery. LPS/Black Knight and its retained counsel were obligated to Plaintiff, and the court, to provide accurate information, and knowingly supplied falsified and inaccurate information, damaging Plaintiff, committing fraud upon the court, AND in direct violation of an existing consent judgment ("Exhibit A").  N&F knew the Plaintiff and the court would rely on the accuracy of the documents in deciding whether a valid claim and a cloud on Plaintiff's title existed. It knew damages would result based on false or negligent misrepresentations, but for LPS (and for N&F) this was an acceptable practice and cost of doing business if caught, as they have been in Plaintiff's case.

Plaintiff has a very real and costly business relationship with his attorney whom he had to retain in order to defend against this cloud to his title in a state court action. Defendant is trying desperately to avoid Plaintiff's suit to proceed because it knows as a logical sequence of discovery it will have to produce a copy of the contracts documenting its relationship with both Chase Bank, as claimed servicer, and N&F as lead law firm, said contracts which will cement relationships among the parties.

Plaintiff's negligence claims, as contained in his Count Seven, contrary to Defendants assertions, already contain the elements Defendants claim it is lacking , and these admissions and elements are again part of the very multi-state consent judgment it signed on pages 17 &18 of Exhibit A, where it states,

*REMEDIATION TO HOMEOWNERS 4.1 "LPS agrees to identify Mortgage Loan Documents executed by LPS between January1, 2008, and December 31, 2010,that may require remediation and to remediate those documents when*

> *LPS has the legal authority to do so and when reasonably necessary to assist any person or borrower or when required by state or local laws".*

(Emphasis added)

LPS/Black Knight was obligated and agreed to help consumers like Mains in remediation of its defective and fraudulent documents. Defendant agreed it clearly owed a duty to consumers, like Plaintiff under the law, it recognized it breached this duty by producing the defective and fraudulent documents and retaining law firms to enforce them. It attempted to gain title to Plaintiff's property through a "sham" foreclosure filed by its retained counsel N & F, injuring Plaintiff economically (attorney's fees and cost to defend), emotionally (divorce, loss of quiet enjoyment of his home), and physically (hospital stay, high blood pressure) as described in his complaint.

In regard to exactly how closely firms like N&F worked with LPS/Black Knight, Plaintiff would further refer the reader to ("Exhibit C"), copies of 2006 and 2007 issues of The Summit, a publication of FIS Foreclosure Solutions, Inc., part of the Fidelity National Financial network of companies. FIS was LPS's predecessor, and changeover to LPS's brand name began in 2007, see the issue 4, December 2007 issue of The Summit, on page 2, where it lists the changeover to LPS

> *"In conjunction with the rebranding of the FIS Loan Portfolio Solutions' (FIS LPS) technology applications in January 2007 to the FIS Desktop suite of products, the URLs of these applications have been updated to reflect the new names as of December 2, 2007. In addition to the FIS Desktop changes, Fidelity National Foreclosure Solutions, Inc. also recently changed our name to FIS Foreclosure Solutions, Inc."*

FIS/LPS freely discusses its then budding relationship and partnership with law firms, **specifically mentioning N&F (see issue 3, October 2007, page 10), discussing its financial incentive program of paying $10-20 per billable file for "top performer" law firms like**

13

**N&F (same issue, page 7), having law firms such as N&F attend summit meetings and golf outings with LPS/Black Knight.** EC Purchasing, an FIS company subsidiary also supplied member firms with hardware, office supplies, and conference calling (See issue 3, September 2006). The hardware is aside from LPS/Black Knight's shared network attorney software programs, like NewTrak, which later became the LPS DeskTop. FIS/LPS was practically joined at the hip with its favored network law firms such as N&F, which is what started raising the eyebrows of the various attorney general ("AG's") offices. This relationship became so intertwined and questionable that it forced the $127 million dollar settlement with LPS/Black Knight in 2013, with the AG's deciding that a Consent Judgment putting a stop to the wholesale assimilation of law firms by a non-law firm entity was the correct move.

Special attention should be given to the September 2006 issue of The Summit on page 16, to an article entitled "Department Spotlight: Document Execution" which mentions how firms like N&F can use FNFS/ LPS software system to "order" assignment documents. One would assume these include pesky, hard to find ones, like documents that needed creation and backdating because they did not exist at time of default letter issuance, or foreclosure filing, were not based on valid underlying *title chain documents, or needed quick robonotary and robosigning, because as the September issue points out,*

> *In January 2006, FNF introduced Signature Required into NewTrak. This feature provides the opportunity for the attorney, FNFS and the client to communicate regarding the execution of documents relating to the foreclosure or bankruptcy. When attorneys click on the Signature Required Button in NewTrak, a pop-up window opens for them to identify the process for which the document needs to be executed. Once the process is selected, a signature required process is opened for attorneys to provide the document that needs to be executed through a step in NewTrak. When the document is loaded into NewTrak ,it automatically prints in Minnesota for the Document Execution team to work.*

The LPS/Black Knight office in Minnesota is where both defendants Jodi Sobotta and Christina Anne Sauerer were employed by LPS/Black Knight, and they were the ones who purportedly executed Plaintiff's assignment with unrecognizable squiggle signatures, but of course Plaintiff has and can provide many versions of Ms. Sobotta's and Ms. Sauerer's signatures, no two squiggles the same.

> *The Document Execution team is set up like a production line, ensuring that each document request is resolved within 24hours. On average, the team will execute 1,000 documents per day. The Document Execution department, totaling 18 associates ,is divided into 2 areas, the Routing team and the Document Review team. The routing team distributes documents between internal team members and to signors. The teams work hand-in-hand to get the documents signed and returned to the attorneys. (See Diagram on page 17).*

The Summit, September 2006, page 16

One wonders at 1000 documents per day how "the team" managed to review the underlying documents for proper chain of title, find someone with authority to sign, find a notary to properly witness the signatures, without missing defects in the underlying title chain or using forgery to sign that many documents a day.  This is why LPS/Black Knight was forced to pay $127 million to "correct" its procedures. N&F was so closely aligned with LPS/Black Knight at the time this settlement action was happening, and during investigations into LPS's robosigning operations, that it cannot now claim ignorance as to its relationship with LPS and knowledge of the investigations and settlements. Despite this it still, until this day, tries to refute any relationship with LPS/Black Knight. Apparently N&F is savvy enough to know where the liability chain will flow as to LPS/Black Knight's and its concerted actions in Plaintiff's case. N&F wants its MTD granted so further discovery into its contract with LPS/Black Knight won't come to light, and Plaintiff is sure that it also would not want a full run of remaining issues of The Summit magazine to make its way into Plaintiff's or the court's hands either. Plaintiff's

common law claims as to fraud, negligent misrepresentation, and negligence should stand against N&F.

### F.   Plaintiff's FDCPA Claims Should Not Be Dismissed.

N&F's request that Plaintiff's FDCPA claims be dismissed is wholly redundant as to LPS/Black Knights arguments as to why Plaintiff's FDCPA claims should be dismissed and fail for the same reasons.  LPS/BlackKnight claims that Plaintiff's only allegation of wrongful conduct by LPS/Black Knight is the execution of an assignment; that they did not participate or communicate with Plaintiff in an attempt to wrongfully or unfairly collect on a debt against Plaintiff; and that they are therefore not a debt collector.

Plaintiff has already pointed out that LPS/Black Knight by their own admission in their multi-state settlement agreement, retained and controlled the attorneys (on behalf of the purported loan servicers) to collect alleged debts from thousands of homeowners, and were very active in controlling the attorneys debt collection activities. They fabricated and provided forged and robosigned documents to wrongfully pursue alleged debts, as they did in Plaintiff's case, and without bothering to verify the veracity of the underlying documents they based their further defective documents on, in direct violation of their 2013 multi-state agreement (and about 400 years of contract and real property law). They used their retained attorneys (N&F in Plaintiff's case) to threaten and to take legal action against homeowners which there would be no foundation to take, BUT FOR the forged and robosigned documents that they produced. Page 25 of LPS/Black Knight's MTD, LPS responds that it was not involved with requesting payments from debtors, making contact, that they did not use unfair methods to collect debts, and again that Plaintiff did not show that it directed or had an interdependence with its law firms.  Plaintiff

16

has already covered and shown in both his Complaint and in this response these responses to be lacking in candor.

N&F and LPS/Black Knight claim that Plaintiff's "lack of due diligence" and LPS/Black Knight and N&F's conduct does not meet the bar for tolling the statute of limitations for the FDCPA.  At no time during discovery in his state court action did Defendants disclose their relationship with each other, or that LPS included fees for their services in the foreclosure Complaint against Plaintiff, and appear to have given incentive payments and other compensation to N&F. N&F failed to advise the Court, or Plaintiff, of their retention by and through LPS, which due diligence was not able to uncover until recently, and which Defendant still will not admit its involvement in despite all the evidence in Plaintiffs Complaint.

Plaintiff submits that a review of Indiana Trial Rule 26 and 33, and their Federal counterparts, might be in order for Defendant LPS/Black Knight and their current counsel, and all the prior law firms who are now named as Defendants in Plaintiff's Complaint.  In the case of *Outback Steakhouse of Florida v. Markley*, 856 N.E.2d 65, 77 (Ind. 2006) the Indiana Supreme Court sums up counsels duty to disclose a material party in discovery,

> However, whether the omission was intentional or negligent, and even if, as appears here, only the attorneys and not the Markley's are responsible for the nondisclosure, we readily conclude that the initial omission was a violation of Indiana Trial Rules 26 and 33 and therefore "misconduct" within the meaning of Rule 60(B)(3).  Whether it was prejudicial remains to be explained.

Plaintiff requested in his state action several times the identity of parties claiming an interest in Plaintiff's note and mortgage, parties who had knowledge of the debt, and who had knowledge regarding "any other amounts claimed owed from Mains."  The silence was

deafening, and it is not because Defendants and their counsel were not required to respond, it was because they were evasive and refused to.

Plaintiff further submits that if all of LPS/Black Knight's assignment fabrication and active concealment of its collection activities with N&F, as described supra, are alleged to not rise to the level of "extraordinary circumstances" required for equitable tolling, then equitable tolling itself is meaningless.  Mains spent paragraphs 194-197 in his Complaint explaining why equitable tolling does apply, and need not further discuss here. Nothing exempts attorney activity in foreclosure matters under the FDCPA either, as noted in *Ray et al v. Nelson & Frankenberger*, case 4:2013cv00114 (7th cir., August 5, 2013),

> *In 1986, Congress amended the FDCPA to provide that attorneys engaged in litigation to recover debts on behalf of third parties can qualify as "debt collectors" under the Act, subject to the same prerequisites for liability as non-attorney debt collectors. See Publ. L. No. 99-361, 100 Stat. 768 (codified as amended at 15 U.S.C. § 1692a(6)). As the Supreme Court has noted, the FDCPA may now apply to lawyers who regularly "engage in consumer-debt-collection activity, even when that activity consists of litigation." Heintz v. Jenkins, 514 U.S. 291, 299 (1995).*

Federal district court judge Sarah Evans Barker also noted in footnote #7 to that case,

> *Plaintiffs also devote a considerable portion of their response, including long litanies of case citations, to establishing two propositions: that "litigation activities can be actionable under the FDCPA," and that "communications issued by debt collectors, directly or through others, to counsel for the debtors can be actionable under the FDCPA." Both statements are true enough—and are not disputed by Defendant—but they do not touch on the key issue here. N&F, as a law firm, might well be liable under the FDCPA for its attempts to collect on the Rays' mortgage debt (an issue we do not reach in this Order); the fact that they sent a debt collection letter through counsel—or to the Rays' counsel, or both— would not disqualify the communication from scrutiny under the statute. But these issues are immaterial here, for they do not relate to whether the September 11 letter was "in connection with" an attempt to collect a debt.*

18

N&F's conduct in sending debt collection and default notices to Plaintiff, and in proceeding in a wrongful foreclosure effort against Plaintiff in close coordination with LPS/ Black Knight both qualifies as wrongful debt collection as defined in the FDCPA, and makes N&F a debt collector, as under the FDCPA, a "debt collector" is defined as:

> *any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."* 15 U.S.C. § 1692a(6).

Defendant's motion to dismiss FDCPA claims should be denied.

### G.    Plaintiff's RICO claims should not be dismissed.

N&F's MTD based on RICO are again wholly redundant with LPS/Black Knight's arguments, and Plaintiff's responses are equally applicable as they were in LPS/Black Knight's MTD.

Plaintiff has already pointed out his cause of action and damages claims against N&F stem from its wrongful and illegal conduct in participating in the creation of robosigned and illegitimate documents as used in Plaintiff's foreclosure action.  N&F wrongful conduct is further evidenced by its awareness of the terms of LPS/Black Knight's multistate consent judgment which requiree LPS/Black Knight to refrain from further creating said robosigned documents and "tweaking" certain elements of its control over its attorney network (including N&F) on behalf of the loan servicers it contracts with.  N&F willfully hid its relationship with LPS/Black Knight from the court in Plaintiff's state action and failed to respond to discovery requests in which it should have disclosed this information, and allowed this part of the RICO enterprise to be hidden from Plaintiff and the court.  N&F was the court enforcer of these

fraudulent actions in concert with LPS/Black Knight, seeking to gain control over Plaintiff's homestead through foreclosure.

LPS/Black Knight and N&F's conduct was unlawful and was part of a larger concerted enterprise of banks and servicing entities (Including Citibank and Chase bank in Plaintiff's case) which it had a repeated pattern of engaging in unlawful conduct for the benefit of the enterprise to take control of real estate assets. The enterprise otherwise lacked the ability to take control of these assets but for LPS/Black Knight's and N&F's assistance as Plaintiff laid out in his Complaint and response brief(s). Plaintiff has already discussed LPS/Black Knight and N&F's direct and distinct unlawful activities as being the cause of part of his injury, much as in *Slorp* and *Iqbal*, supra, and but for this activity, Plaintiff would not have incurred damages. Plaintiffs damages were not caused as a result of his failure to make loan payments on a still yet undefined "loan" transaction, it was having to defend against LPS/Black Knight's unlawful fraud in concert with the other named Defendants (including N&F) who were party to the RICO enterprise. Mains' Complaint carefully lays out in paragraphs 88-98 how the RICO enterprise operated among participants, and in paragraph 202-212 further details as to the structure and participants. Plaintiff further points out in paragraph 204 that, "18 U.S. Code § 1962(d), also makes it unlawful for any person to conspire to violate RICO."

Defendant denies Plaintiff addressed issues of "cooperation and coordination," "enterprise," "structure and goals," which Plaintiff did address in his complaint. Plaintiff and the multistate consent judgment both discuss LPS/Black Knight's unique service in providing robosigned documents which were used for the benefit of the enterprise, and the control LPS exerted over the network of attorneys, like N&F, it retained for the banks and servicing entities. Defendant clearly wants their MTD to be granted because they hope this will prevent discovery

which will further cement Plaintiff's existing RICO claim elements.  Plaintiff has met his initial

burden as to sustaining his RICO claims, and Defendant is improperly trying to get the claims

prematurely dismissed, and their motion to dismiss count ten should be denied.

## CONCLUSION

Defendant N&F's Motion to Dismiss should be DENIED in its entirety and Plaintiff's

Claims/Counts should be preserved[4] for the reasons cited supra and because factual issues

remain for the trier of fact.


Respectfully submitted.


/S/ Jon M. Schulte_____
Jon M. Schulte
Attorney for Plaintiff
Smith, Carpenter, Fondrisi
& Cummins, LLC
209 E. Chestnut Street, P.O. Box 98
Jeffersonville, IN  47131
(812) 282-7736

---

[4] Plaintiff, reserves the right to include LPS/Black Knight in existing claims or new ones as discovery might lead to.

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2015, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System.  Parties may access this filing through the Court's system.

Vilda Samuel Laurin, III     slaurin@boselaw.com, cosman@boselaw.com

Thomas Eugene Mixdorf     thomas.mixdorf@icemiller.com, carla.persons@icemiller.com

Michael A. Dorelli     mdorelli@hooverhullturner.com, rmiller@hooverhullturner.com

Nathan T. Danielson     ndanielson@boselaw.com, mwakefield@boselaw.com, rmurphy@boselaw.com

Derek R. Molter     derek.molter@icemiller.com, bunn@icemiller.com

Patrick A. Ziepolt     pziepolt@hooverhullturner.com, gsmith@hooverhullturner.com, patrick.ziepolt@gmail.com

Fred O. Goldberg     fgoldberg@bergersingerman.com, mferguson@bergersingerman.com

/S/ Jon M. Schulte_____
Jon M. Schulte